THE UNITED STATES, APPELLANTS, v. FRANCIS P. FERREIRA, ADMINISTRATOR OF FRANCIS PASS, DECEASED.

The treaty of 1819, between the United States and Spain, contains the following stipulation, viz.: —

"The United States shall cause satisfaction to be made for the injuries, if any, which by process of law shall be established to have been suffered by the Spanish officers and individual Spanish inhabitants by the late operations of the American army in Florida."

Congress, by two acts passed in 1823 and 1834, (3 Stat. at Large 768, and 6 Stat. at Large 569,) directed the judge of the Territorial Court of Florida to receive, examine, and adjudge all cases of claims for losses, and report his decisions, if in favor of the claimants, together with the evidence upon which they were founded, to the Secretary of the Treasury, who, on being satisfied that the same was just and equitable, within the provisions of the treaty, should pay the amount thereof; and by an act of 1849, (9 Stat. at Large p. 788,) Congress directed the judge of the District Court of the United States for the Northern District of Florida, to receive and adjudicate certain claims in the manner directed by the preceding acts.

From the award of the district judge, an appeal does not lie to this court.

As the treaty itself designated no tribunal to assess the damages, it remained for Congress to do so by referring the claims to a commissioner according to the established practice of the government in such cases. His decision was not the judgment of a court, but a mere award, with a power to review it, conferred upon the Secretary of the Treasury.

(Mr. Justice WAYNE did not sit in this cause.)

THIS was an appeal from the District Court of the United States for the Northern District of Florida.

The facts of the case are stated in the opinion of the court.

It was argued by *Mr. Crittenden*, who placed the case upon the ground which will be presently stated, and by *Mr. Johnson* for the appellee. There were also briefs filed on the same side by *Mr. Sherman*, *Mr. W. Cost Johnson*, and *Mr. Ewing*.

*Mr. Crittenden*, after giving a history of the cause and the laws, proceeded.

The District Judge, being satisfied with the causes assigned why this claim was not presented under the act of 1834, adjudicated to the petitioner, upon his claim and proof, as the amount or value of his losses, $6,080, and for interest thereon at the rate of 5 per cent. from the tenth of May, 1813, to the 26th June, 1835, $6,726.83, making in all $12,806.83.

From this decision the District Attorney prayed an appeal to the Supreme Court of the United States, " to the end, that he might, if the laws allowed it, prosecute such appeal if instructed to do so." I know nothing more of this proceeding than that, upon this appeal, the case has been brought to this court; and being here, it would be quite agreeable to me if the court would, by its high authority, settle and determine all the questions that arise out of this case, and which are presented before the Treasury Department in many others of a like character, and especially the question respecting the allowance of interest on the amount of the losses or injuries sustained by the claimants.

These questions have from the first been subjects of controversy between the claimants and the Secretary of the Treasury, and are likely to continue so till some higher authority shall interpose. It would be conducive to the public interest, and certainly desirable to the government, to obtain the judgment and directions of this enlightened court on this vexed subject.

In the adjustment or adjudication of these Florida claims by the Florida judges, interest was allowed, except in a few instances. The first of these adjudications were presented to the Secretary of the Treasury for payment in the year 1825, and others have been constantly and successively presented from that time to the present. The number of claims thus presented is about two hundred, and the amount paid has exceeded one million of dollars. But from the first, and in every case where interest had been allowed by the Florida judge, the principal only was paid, and the interest disallowed and rejected by the Secretary of the Treasury. For the period of the last twenty-five years this has been the unvaried and uniform course of decision and action by every successive Secretary of the Treasury, who has acted on the subject, sustained by the official opinions of several attorneys-general, and without the expressed dissent of any one of them officially declared.

It is respectfully insisted on the part of the United States that such a uniform and long continued series and course of decision has made the disallowance of interest, in whatever form awarded, a res adjudicata.

Congress had power to create a special tribunal, with jurisdiction to examine and adjust or adjudge these claims arising under the treaty with Spain. Their power in this respect was

4 *

plenary and discretionary.  By the acts above referred to they exercised that power, and created such a tribunal.  It was a judicatory tribunal which they established, consisting of two parts or members, namely, one of the territorial judges of Florida to act and decide in the first instance; and secondly, the Secretary to exercise a revisory power or jurisdiction over the decisions of the Florida judge, paying the amount of them only " on being satisfied that the same is just and equitable within the provisions of the treaty."  To this tribunal, thus constituted, Congress gave authority to decide on these claims; the decision of the Secretary of the Treasury being revisory and final.  His decision was in its nature judicial, and made of the matter decided, a *res adjudicata,* in every rational and legitimate sense of those terms.  The decision of a special or limited tribunal upon a subject within its jurisdiction is just as conclusive and binding as the judgments of courts of the highest and most unlimited jurisdiction.

The present case is, in its origin, and in respect to the question of interest, identical with the other Florida cases above alluded to.

I take it for granted that the substitution of the judge of the District Court of the United States, &c., in place of the territorial judge, as the person to adjust or adjudge these claims, can in no respect make any material difference.  The authority of the one and the other is exactly the same, and the effect of their acts the same, whether they be called judges, or commissioners as in the above-cited act of Congress of 22d February, 1847.  The act of Congress is the measure of their authority and of the effect of their proceedings under that authority.

*Mr. Johnson* was the only counsel who argued the case orally, for the appellee; the other counsel filed briefs.  It is proper to say, that a motion had been made by the counsel for the appellee to dismiss the case for want of jurisdiction.  This may serve to explain the preliminary remarks of Mr. Johnson, which were as follows:

It is our earnest wish, in behalf of the appellee, that this court should take jurisdiction of the case, and hear and decide it upon the merits, that if the decision of the court below be wrong, its errors may be corrected, and we may know the limits of our rights; and if the decision be correct, that it may be so pronounced by the authoritative voice of this high tribunal.

Nevertheless, in order to raise such questions as may be thus raised, we have found it necessary to move to dismiss the appeal.  In the consideration of that motion, however, we do not feel bound to use such arguments only as will tend to show that

The United States *v*. Ferreira.

an appeal does not liê in this case, but think we may with propriety present such views on the subject, and refer to such authorities, as in our judgment in any manner bear upon the question, and which will enable the court the more readily to apprehend and decide it.

The question now strictly before the court involves the nature of the claim, and the character of the tribunal whose decision is here for revision. We will, therefore, consider it in this order, and —

1st. As to the nature of the claim; is it, and is the class to which it belongs, the proper subject of judicial investigation and decision ?

(Then followed an explanation of the case, after which the inference was drawn.)

There can be, therefore, no objection to the ordinary jurisdiction of the courts of the United States arising from the nature of these claims. They are proper subjects for the investigation of courts of justice, involving as they do questions touching the rights of property and injuries thereto. They fall properly within the jurisdiction of courts of the United States, as the judicial inquiry, and the rights to which it refers, arise out of treaty stipulations, and acts of Congress to carry the treaty into effect.

They are, therefore, wholly unlike the duties attempted to be imposed by the act of March 3, 1792, on the Circuit and District Courts, relative to pensions, and which they refused to perform because they were not judicial, holding the act for that, among other things, unconstitutional and void. Vide 2 Dall. Rep. 410, note.

Whatever analogy, therefore, may be found in other respects, or if not found, made by construction, between the act of 1792 and that of 1823, they differ wholly in this, that the duty imposed by that act was not judicial in its nature ; in this, it is strictly so ; and the instructions of the legislature to the judicial tribunals on whom the duty is imposed " to receive, examine, and adjudge," is an explicit instruction to perform that duty judicially.

II. We have next to consider the character of the tribunal whose decision is before this court for revision; and on this point several inquiries suggest themselves :

1st. Was it a mere commission, not judicial in its character, whose decision might be taken up to, and revised by, the Secretary of the Treasury in his capacity as an executive officer ?

2d. Or was it a judicial tribunal, part of a judicial system, created by the acts of 1823 and 1834, under the treaty, which acted and decided judicially, but from which an appeal lay, not to this court, but to the Secretary of the Treasury, as the highest

appellate tribunal in that special system created under the treaty by those statutes?

3d. Or was it a judicial tribunal whose decision was final in all cases coming within the special jurisdiction conferred upon it under the treaty?

4th. Or was it an ordinary judicial tribunal, from which, in these as in other cases, an appeal lies to this court?

(Upon each of these questions the argument was very elaborate.)

III. Then arises the question, is the decision final, or does an appeal lie from it to this court?

There is nothing in the nature of the case itself, or the mode of proceeding directed by the acts of 1823 and 1834, which tends to settle this question. If the United States had not assumed the satisfaction of these injuries, suits would have been brought against the trespassers in the usual form, and a writ of error would have lain to revise the judgments. But the United States assumes the liability, agrees by treaty to open her courts, and allow the injuries to be established by her legal process, and binds herself to make satisfaction for the injuries, if any, which shall be so established. But the United States is not formally made defendant on the record; this was not directed by the acts of Congress, but the claims were presented to the tribunals which she designated " to receive, examine, and adjudge " them. They were claims against the United States, and it is not a matter of substance whether she was named on the record as defendant or not; they were, nevertheless, " cases," within the legal meaning of the term; whether belonging to that numerous class of cases called in the books *ex parte,* or the still more numerous class of cases *inter partes,* is immaterial. But what militates against the right of appeal is the provision, that the judges shall report their decision to the Secretary of the Treasury, who shall " pay the amount thereof."

But, on the other hand, we perceive nothing in these statutes to cut off an appeal, if the decision be against the claimant. The case before the court was prosecuted in, and decided by, the District Court of Florida, and there seems to be no other reason, than that named, why the general law authorizing appeals from those courts should not extend to and embrace this case. If, however, an appeal do not lie, it must be, as we think, because the decision of the judge of the District Court of Florida was final, not because the Secretary of the Treasury is the appellate tribunal,

Mr. Chief Justice TANEY delivered the opinion of the court.
This purports to be an appeal from the District Court of the

United States for the Northern District of, Florida. The case brought before the court is this :

The treaty of 1819 by which Spain ceded Florida to the United States, contains the following stipulation in the 9th article.

" The United States shall cause satisfaction to be made for the injuries if any, which by process of law shall be established to have been suffered by the Spanish officers and individual Spanish inhabitants by the late operations of the American army in Florida."

In 1823 Congress passed an act to carry into execution this article of the treaty. The 1st section of this law authorizes the judges of the superior courts established at St. Augustine and Pensacola respectively, to receive and adjust all claims arising within their respective jurisdictions, agreeably to the provisions of the article of the treaty above mentioned ; and the 2d section provides " that in all cases where the judges shall decide in favor of the claimants the decisions, with the evidence on which they are founded, shall be by the said judges reported to the Secretary of the Treasury, who on being satisfied that the same is just and equitable, within the provisions of the treaty, shall pay the amount thereof to the person or persons in whose favor the same is adjudged."

Under this law the Secretary of the Treasury held that it did not apply to injuries suffered from the causes mentioned in the treaty of 1812 and 1813, but to those of a subsequent period. And in conseqence of this decision, another law was passed in 1834, extending the provisions of the former act to injuries suffered in 1812 and 1813, but limiting the time for presenting the claims to one year from the passage of the act. This law embraced the claim of the present claimant.

He did not, however, present his claim within the time limited. And in 1849 a special law was passed authorizing the District Judge of the United States for the Northern District of Florida, to receive and adjudicate this claim and that of certain other persons mentioned in the law, under the act of 1834 ; the several claims to be settled by the Treasury as in other cases under the said act. Florida had become a State of the Union in 1849, and therefore the District Judge was substituted in the place of the territorial officer.

Ferreira presented his claim according to the District Judge, who took the testimony offered to support it, and decided that the amount stated in the proceedings was due to him. The District Attorney of the United States, prayed an appeal to this court, from this decision ; and under that prayer the case has been docketed here as an appeal from the District Court.

The only question now before us is whether we have any jurisdiction in the case. And in order to determine that question we must examine the nature of the proceeding, before the District Judge, and the character of the decision from which this appeal has been taken.

The treaty certainly created no tribunal by which these damages were to be adjusted, and gives no authority to any court of justice to inquire into or adjust the amount which the United States were to pay to the respective parties who had suffered damage from the causes mentioned in the treaty. It rested with Congress to provide one, according to the treaty stipulation. But when that tribunal was appointed it derived its whole authority from the law creating it, and not from the treaty; and Congress had the right to regulate its proceedings and limit its power; and to subject its decisions to the control of an appelate tribunal, if it deemed it advisable to do so.

Undoubtedly Congress was bound to provide such a tribunal as the treaty described. But if they failed to fulfil that promise, it is a question between the United States and Spain. The tribunal created to adjust the claims cannot change the mode of proceeding or the character in which the law authorizes it to act, under any opinion it may entertain, that a different mode of proceeding, or a tribunal of a different character, would better comport with the provisions of the treaty. If it acts at all, it acts under the authority of the law and must obey the law.

The territorial judges therefore, in adjusting these claims, derived their authority altogether from the laws above mentioned; and their decisions can be entitled to no higher respect or authority than these laws gave them. They are referred by the act of 1823, to the treaty for the description of the injury which the law requires them to adjust; but not to enlarge the power which the law confers, nor to change the character in which the law authorizes them to act.

The law of 1823, therefore, and not the stipulations of the treaty, furnishes the rule for the proceeding of the territorial judges, and determines their character. And it is manifest that this power to decide upon the validity of these claims, is not conferred on them as a judicial function, to be exercised in the ordinary forms of a court of justice. For there is to be no suit; no parties in the legal acceptance of the term, are to be made — no process to issue; and no one is authorized to appear on behalf of the United States, or to summon witnesses in the case. The proceeding is altogether *ex parte;* and all that the judge is required to do, is to receive the claim when the party presents it, and to adjust it upon such evidence as he may have before him, or be able himself to obtain. But neither the evidence, nor

his award, are to be filed in the court in which he presides, nor recorded there; but he is required to transmit, both the decision and the evidence upon which he decided, to the Secretary of the Treasury; and the claim is to be paid if the Secretary thinks it just and equitable, but not otherwise. It is to be a debt from the United States upon the decision of the Secretary, but not upon that of the judge.

It is too evident for argument on the subject, that such a tribunal is not a judicial one, and that the act of Congress did not intend to make it one. The authority conferred on the respective judges was nothing more than that of a commissioner to adjust certain claims against the United States; and the office of judges, and their respective jurisdictions, are referred to in the law, merely as a designation of the persons to whom the authority is confided, and the territorial limits to which it extends. The decision is not the judgment of a court of justice. It is the award of a commissioner. The act of 1834 calls it an award. And an appeal to this court from such a decision, by such an authority from the judgment of a court of record, would be an anomaly in the history of jurisprudence. An appeal might as well have been taken from the awards of the board of commissioners, under the Mexican treaty, which were recently sitting in this city.

Nor can we see any ground for objection to the power of revision and control given to the Secretary of the Treasury. When the United States consent to submit the adjustment of claims against them to any tribunal, they have a right to prescribe the conditions on which they will pay. And they had a right therefore to make the approval of the award by the Secretary of the Treasury, one of the conditions upon which they would agree to be liable. No claim, therefore, is due from the United States until it is sanctioned by him; and his decision against the claimant for the whole or a part of a claim as allowed by the judge is final and conclusive. It cannot afterwards be disturbed by an appeal to this or any other court, or in any other way, without the authority of an act of Congress.

It is said, however, on the part of the claimant, that the treaty requires that the injured parties should have an opportunity of establishing their claims by a process of law; that process of law means a judicial proceeding in a court of justice; and that the right of supervision given to the Secretary, over the decision of the District Judge, is therefore a violation of the treaty.

The court think differently; and that the government of this country is not liable to the reproach of having broken its faith with Spain. The tribunals established are substantially the same with those usually created, where one nation agrees by

treaty to pay debts or damages which may be found to be due to the citizens of another country. This treaty meant nothing more than the tribunal and mode of proceeding ordinarily established on such occasions; and well known and well understood when treaty obligations of this description are undertaken. But if it were admitted to be otherwise, it is a question between Spain and that department of the government which is charged with our foreign relations; and with which the judicial branch has no concern. Certainly the tribunal which acts under the law of Congress, and derives all its authority from it, cannot call in question the validity of its provisions, nor claim absolute and final power for its decisions, when the law by virtue of which the decisions are made, declares that they shall not be final, but subordinate to that of the Secretary of the Treasury, and subject to his reversal.

And if the judicial branch of the government had the right to look into the construction of the treaty in this respect, and was of opinion that it required a judicial proceeding; and that the power given to the Secretary was void as in violation of the treaty, it would hardly strengthen the case of the claimant on this appeal. For the proceedings before the judge are as little judicial in their character as that before the Secretary. And if his decisions are void on that account, the decisions of the judge are open to the same objections; and neither the principal nor interest, nor any part of this claim could be paid at the Treasury. For if the tribunal is unauthorized, the awards are of no value.

The powers conferred by these acts of Congress upon the judge as well as the Secretary, are, it is true, judicial in their nature. For judgment and discretion must be exercised by both of them. But it is nothing more than the power ordinarily given by law to a commissioner appointed to adjust claims to lands or money under a treaty; or special powers to inquire into or decide any other particular class of controversies in which the public or individuals may be concerned. A power of this description may constitutionally be conferred on a Secretary as well as on a commissioner. But is not judicial in either case, in the sense in which judicial power is granted by the Constitution to the courts of the United States.

The proceeding we are now considering, did not take place before one of the territorial judges, but before a District Judge of the United States. But that circumstance can make no difference. For the act of 1849, authorizes him to receive and adjudicate the claims of the persons mentioned in the law, under the act of 1834; and provides that these claims may be settled by the Treasury, as other cases under the said act. It conferred on the District Judge, therefore, the same power, and the same character,

and imposed on him the same duty that had been conferred and imposed on the territorial judges before Florida became a State.

It would seem, indeed, in this case, that the District Judge acted under the erroneous opinion that he was exercising judicial power strictly speaking under the Constitution, and has given to these proceedings as much of the form of proceedings in a court of justice as was practicable. A petition in form is filed by the claimant; and the judge states in his opinion that the District Attorney appeared for the United States, and argued the case, and prayed an appeal. But the acts of Congress require no petition. The claimant had nothing to do, but to present his claim to the judge with the vouchers and evidence to support it. The District Attorney had no right to enter an appearance for the United States, so as to make them a party to the proceedings, and to authorize a judgment against them. It was no doubt his duty as a public officer, if he knew of any evidence against the claim, or of any objection to the evidence produced by the claimant, to bring it before the judge, in order that he might consider it, and report it to the Secretary. But the acts of Congress certainly do not authorize him to convert a proceeding before a commissioner into a judicial one, nor to bring an appeal from his award before this court.

The question as to the character in which a judge acts in a case of this description, is not a new one. It arose as long ago as 1792, in Hayburn's case, reported in 2 Dall. 409.

The act of 23d of March, in that year, required the Circuit Courts of the United States to examine into the claims of the officers and soldiers and seamen of the Revolution, to the pensions granted to invalids by that act, and to determine the amount of pay that would be equivalent to the disability incurred, and to certify their opinion to the Secretary of War. And it authorized the Secretary, when he had cause to suspect imposition or mistake, to withhold the pension allowed by the court, and to report the case to Congress at its next session. The authority was given to the Circuit Courts; and a question arose whether the power conferred was a judicial one, which the Circuit Courts, as such, could constitutionally exercise.

The question was not decided in the Supreme Court in the case above mentioned. But the opinions of the judges of the Circuit Courts for the Districts of New York, Pennsylvania, and North Carolina, are all given in a note to the case by the reporter.

The judges in the New York Circuit, composed of Chief Justice Jay, Justice Cushing, and Duane, District Judge, held that the power could not be exercised by them as a court. But in

consideration of the meritorious and benevolent object of the law, they agreed to construe the power as conferred on them individually as commissioners, and to adjourn the court over from time to time, so as to enable them to perform the duty in the character of commissioners, and out of court.

The judges of the Pennsylvania Circuit, consisting of Wilson and Blair, Justices of the Supreme Court, and Peters, District Judge, refused to execute it altogether, upon the ground that it was conferred on them as a court, and was not a judicial power when subject to the revision of the Secretary of War and Congress.

The judges of the Circuit Court of North Carolina, composed of Iredell, Justice of the Supreme Court, and Sitgreaves, District Judge, were of opinion that the court could not execute it as a judicial power; and held it under advisement whether they might not construe the act as an appointment of the judges personally as commissioners, and perform the duty in the character of commissioners out of court, as had been agreed on by the judges of the New York Circuit.

These opinions, it appears by the report in 2 Dall., were all communicated to the President, and the motion for a mandamus in Hayburn's case, at the next term of the Supreme Court, would seem to have been made merely for the purpose of having it judicially determined in this court, whether the judges, under that law, were authorized to act in the character of commissioners. For every judge of the court, except Thomas Johnson, whose opinion is not given, had formally expressed his opinion, in writing, that the duty imposed, when the decision was subject to the revision of a Secretary and of Congress, could not be executed by the court as a judicial power: and the only question upon which there appears to have been any difference of opinion, was whether it might not be construed as conferring the power on the judges personally as commissioners. And if it would bear that construction, there seems to have been no doubt, at that time, but that they might constitutionally exercise it, and the Secretary constitutionally revise their decisions. The law, however, was repealed at the next session of the legislature, and a different way provided for the relief of the pensioners: and the question as to the construction of the law was not decided in the Supreme Court. But the repeal of the act clearly shows that the President and Congress acquiesced in the correctness of the decision, that it was not a judicial power.

This law is the same in principle with the one we are now considering, with this difference only, that the act of 1792 imposed the duty on the court *eo nomine,* and not personally on the judges. In the case before us it is imposed upon the judge, and

it appears from the note to the case of Hayburn, that a majority of the judges of the Supreme Court were of opinion that if the law of 1792 had conferred the power on the judges, they would have held that it was given to them personally by that description; and would have performed the duty as commissioners, subject to the revision and control of the Secretary and Congress, as provided in the law. Nor have Justices Wilson, Blair, and Peters, District Judges, dissented from this opinion. Their communication to the President is silent upon this point. But the opinions of all the judges embrace distinctly and positively the provisions of the law now before us, and declare that, under such a law, the power was not judicial within the grant of the Constitution, and could not be exercised as such.

Independently of these objections, we are at some loss to understand how this case could legally be transmitted to this court, and certified as the transcript of a record in the District Court. According to the directions of the act of Congress, the decision of the judge and the evidence on which it is founded, ought to have been transmitted to the Secretary of the Treasury. They are not to remain in the District Court, nor to be recorded there. They legally belong to the office of the Secretary of the Treasury, and not to the court; and a copy from the clerk of the latter would not be evidence in any court of justice. There is no record of the proceedings in the District Court of which a transcript can legally be made and certified and consequently there is no transcript now before us that we an recognize as evidence of any proceeding or judgment in that court.

A question might arise whether commissioners appointed to adjust these claims, are not officers of the United States within the meaning of the Constitution. The duties to be performed are entirely alien to the legitimate functions of a judge or court of justice, and have no analogy to the general or special powers ordinarily and legally conferred on judges or courts to secure the due administration of the laws. And, if they are to be regarded as officers, holding offices under the government, the power of appointment is in the President, by and with the advice and consent of the senate; and Congress could not by law, designate the persons to fill these offices. And if this be the construction of the Constitution, then as the judge designated could not act in a judicial character as a court, nor as a commissioner, because he was not appointed by the President, every thing that has been done under the acts of 1823, and 1834, and 1849, would be void, and the payments heretofore made, might be recovered back by the United States. But this question has not been made; nor does it arise in the case. It could arise only in a suit by the United States to recover back the money. And

as the case does not present it, and the parties interested are
not before the court, and these laws have for so many years
been acted on as valid and constitutional we do not think it
proper to express an opinion upon it. In the case at bar, the
power of the judge to decide in the first instance, is assumed
on both sides, and the controversy has turned upon the power
of the Secretary to revise it; and it is in this aspect of the
case, that it has been considered by the court, in the foregoing
opinion.

The appeal must be dismissed for want of jurisdiction.

## *Order.*

This cause came on to be heard on the transcript of the re-
cord from the District Court of the United States for the North-
ern District of Florida, and was argued by counsel. On con-
sideration whereof, it is now here ordered, adjudged, and decreed
by this court, that this cause be, and the same is hereby dis-
missed for the want of jurisdiction.

NOTE BY THE CHIEF JUSTICE, INSERTED BY ORDER OF THE COURT.

Since the aforegoing opinion was delivered, the attention of the court has been
drawn to the case of the United States *v.* Yale Todd, which arose under the act of
1792, and was decided in the Supreme Court, February 17, 1794. There was no offi-
cial reporter at that time, and this case has not been printed. It shows the opinion
of the court upon a question which was left in doubt by the opinions of the different
judges, stated in the note to Hayburn's case. And as the subject is one of much in-
terest, and concerns the nature and extent of judicial power, the substance of the
decision in Yale Todd's case is inserted here, in order that it may not be overlooked,
if similar questions should hereafter arise.

The 2d, 3d, and 4th sections of the act of 1792, were repealed at the next session
of Congress by the act of February 28, 1793. It was these three sections that gave
rise to the questions stated in the note to Hayburn's case. The repealing act pro-
vided another mode for taking testimony, and deciding upon the validity of claims to
the pensions granted by the former law; and by the 3d section it saved all rights to
pensions which might be founded "upon any legal adjudication," under the act of
1792, and made it the duty of the Secretary of War, in conjunction with the Attorney-
General, to take such measures as might be necessary to obtain an adjudication of
the Supreme Court, "on the validity of such rights, claimed under the act aforesaid,
by the determination of certain persons styling themselves commissioners."

It appears from this case, that Chief Justice Jay and Justice Cushing acted upon
their construction of the act of 1792, immediately after its passage and before it was
repealed. And the saving and proviso, in the act of 1793, was manifestly occasioned
by the difference of opinion upon that question which existed among the justices, and
was introduced for the purpose of having it determined, whether under the act con-
ferring the power upon the Circuit Courts, the judges of those courts when refusing
for the reasons assigned by them to acts as courts, could legally act as commissioners
out of court. If the decision of the judges, as commissioners, was a legal adjudica-
tion, then the party's right to the pension allowed him was saved; otherwise not.

In pursuance of this act of Congress, the case of Yale Todd was brought before the
Supreme Court, in an amicable action, and upon a case stated at February Term,
1794.

The case was docketed by consent, the United States being plaintiff and Todd the
defendant. The declaration was for one hundred and seventy-two dollars and ninety-
one cents, for so much money had and received by the defendant to the use of the
United States; to which the defendant pleaded *non assumpsit.*

The case as stated, admitted that on the 3d of May, 1792, the defendant appeared before the Hon. John Jay, William Cushing, and Richard Law, then being judges of the Circuit Court held at New Haven, for the District of Connecticut, then and there sitting, and claiming to be commissioners under the act of 1792, and exhibited the vouchers and testimony to show his right under that law to be placed on the pension list; and that the judges above named, being judges of the Circuit Court, and then and there sitting at New Haven, in and for the Connecticut District, proceeded, as commissioners designated in the said act of Congress, to take the testimony offered by Todd, which is set out at large in the statement, together with their opinion that Todd ought to be placed on the pension list, and paid at the rate of two thirds of his former monthly wages, which they understood to have been eight dollars and one third per month, and the sum of one hundred and fifty dollars for arrears.

The case further admits, that the certificate of their proceedings and opinions, and the testimony they had taken, were afterwards, on the 5th of May, 1792, transmitted to the Secretary of War, and that by means thereof Todd was placed on the pension list, and had received from the United States one hundred and fifty dollars for arrears, and twenty-two dollars and ninety-one cents claimed for his pension aforesaid, said to be due on the 2d of September, 1792.

And the parties agreed that if upon this statement the said judges of the Circuit Court sitting as commissioners, and not as a Circuit Court, had power and authority by virtue of said act so to order and adjudge - of and concerning the premises, that then judgment should be given for the defendant, otherwise for the United States, for one hundred and seventy-two dollars and ninety-one cents, and six cents cost.

The case was argued by Bradford, Attorney-General for the United States, and Hillhouse for the defendant; and the judgment of the court was rendered in favor of the United States for the sum above mentioned. -

Chief Justice Jay and Justice Cushing, Wilson, Blair, and Paterson, were present at the decision. No opinion was filed stating the grounds of the decision. Nor is any dissent from the judgment entered on the record. It would seem, therefore, to have been unanimous, and that Chief Justice Jay and Justice Cushing became satisfied, on further reflection, that the power given in the act of 1792 to the Circuit Court as a court, could not be construed to give it to the judges out of court as commissioners. It must be admitted that the justice of the claims and the meritorious character of the claimants would appear to have exercised some influence on their judgments in the first instance, and to have led them to give a construction to the law which its language would hardly justify upon the most liberal rules of interpretation.

The result of the opinions expressed by the judges of the Supreme Court of that day in the note to Hayburn's case, and in the case of the United States *v.* Todd, is this :

1. That the power proposed to be conferred on the Circuit Courts of the United States by the act of 1792 was not judicial power within the meaning of the Constitution, and was, therefore, unconstitutional, and could not lawfully be exercised by the courts.

2. That as the act of Congress intended to confer the power on the courts as a judicial function, it could not be construed as an authority to the judges composing the court to exercise the power out of court in the character of commissioners.

3. That money paid under a certificate from persons not authorized by law to give it, might be recovered back by the United States.

The case of Todd was docketed by consent in the Supreme Court; and the court appears to have been of opinion that the act of Congress of 1793, directing the Secretary of War and Attorney-General to take their opinion upon the question, gave them original jurisdiction. In the early days of the Government, the right of Congress to give original jurisdiction to the Supreme Court, in cases not enumerated in the Constitution, was maintained by many jurists, and seems to have been entertained by the learned judges who decided Todd's case. But discussion and more mature examination has settled the question otherwise ; and it has long been the established doctrine, and we believe now assented to by all who have examined the subject, that the original jurisdiction of this court is confined to the cases specified in the Constitution, and that Congress cannot enlarge it. In all other cases its power must be appellate.