## In re INTERSTATE COMMERCE COMMISSION.

### (Circuit Court, N. D. Illinois. December 7, 1892.)

CONSTITUTIONAL LAW—INTERSTATE COMMERCE COMMISSION—JURISDICTION.

So much of the twelfth section of the interstate commerce act as assumes to authorize the circuit courts to make orders enforcing subpœnas issued by the interstate commerce commission is unconstitutional, since the constitutional grant of jurisdiction to the federal courts in "cases in law and equity" does not authorize those courts to use their powers merely in aid of an investigation before an administrative body.

Application by the Interstate Commerce Commission for an order to compel W. G. Brimson, J. S. Keefe, W. R. Stanley, and others to produce certain books and papers before the commission, and to answer certain questions. Application dismissed.

Thomas E. Milchrist, U. S. Dist. Atty., John P. Hand, Asst. Dist. Atty., and Walter D. Dabney, special counsel, for Interstate Commerce Commission.

Lyman Trumbull, John P. Wilson, Williams, Holt & Wheeler, and Prussing, Hutchins & Goodrich, for Calumet & Blue Island Railway Company and the witnesses.

GRESHAM, Circuit Judge. June 18, 1892, the Interstate Commerce Commission made an order at Washington, requiring the Calumet & Blue Island Railway Company, the Joliet & Blue Island Railway Company, the Chicago & Southeastern Railway Company,

the Chicago & Kenosha Railway Company, and the Milwaukee, Bay View & Chicago Railway Company, and certain other railway companies, to appear at Chicago on July 13th, to answer an informal complaint, made by unknown persons, charging that the Illinois Steel Company had caused the four first-named companies to be organized for the purpose of operating their switches and side tracks at or near Chicago, and engaging in traffic by continuous shipment from places without the state of Illinois to places within that state, in connection with other named carriers, and had caused the last-named company to be organized for the purpose of engaging in like business in Wisconsin; that the steel company owned the five companies, and for six months had operated them, in connection with other named railroad companies, as a convenient device for evading the provisions of the interstate commerce act, and obtaining unjust preferences and illegal rates on interstate business. The five companies were particularly required to answer the following questions under oath:

" (1) Does any traffic contract, agreement, or arrangement, in writing or otherwise, exist between the companies above alleged to be under the control and operated by said Illinois Steel Company and any of the other companies with reference to interstate traffic? If so, state contract, agreement, or arrangement.

" (2) Are any tariffs of rates and charges for the transportation of interstate property in effect between said companies above alleged to be under the control of and operated by said Illinois Steel Company and said other railroad companies? If so, what are they, and what are the divisions thereof between the several carriers?

" (3) Have the companies alleged to be under the control of and operated by the Illinois Steel Company received interstate traffic from any of the other carriers above mentioned during the six months last past, or have they delivered any of said traffic to such other carriers during that time for any person, firm, or company other than the Illinois Steel Company? and, if so, to what extent?"

The commission met at the time and place appointed, and the companies alleged to be owned and controlled by the steel company, except the Calumet & Blue Island, appeared, and in writing, under oath, answered the three questions in the negative, and denied that during the six months previous to the entry of the order for the investigation they had engaged in interstate commerce. The other company, the Calumet & Blue Island, filed a verified answer, averring that it had not engaged in interstate traffic for six months before the filing of the alleged complaint; that no traffic agreement or arrangement existed between it and any of the alleged connecting companies; that no schedule of charges for the transportation of property from one state to another state was in effect between it and other connecting roads other than this: that on June 13, 1892, it united with the Pennsylvania Railroad Company in a tariff of $2.75 per net ton on car lots of coal from points on the Southwestern Pennsylvania Railroad and the Youghiogheny Northern Railroad to Joliet, by way of Chicago, of which it received 40 cents per net ton, that amount having long been the proportion of the through rate allowed to other carriers for the same haul between Chicago and Joliet; that on July 6, 1892, it entered into a similar contract with the Lake Shore & Michigan Southern Railway Company and the Pittsburgh & Lake Erie Railway Company. The answer denied that

the company's road was operated, as a device to evade the provisions of the act; denied that its operation resulted in giving the steel company illegal rates, or in affording it any kind of advantage or preference; and denied that it had neglected to file with the commission copies of any agreements or tariffs as required by the act.

Certain officers of the five railroad companies and an officer of the steel company appeared before the commission as witnesses in obedience to its subpoena, and, having failed to elicit any facts from them which materially tended to support the charge of unlawful discrimination in favor of the latter company, the commission demanded the stock books of the steel company and the stock books of the five railroad companies for inspection, and in that connection inquired of the witnesses whether they knew who owned the five companies, and especially whether the steel company owned them, or a majority of their stock. On the advice of counsel, the witnesses refused to produce the books or answer the questions, and the commission applied to this court for an order to compel them to do both.

The application is based upon the twelfth section of the commerce act, which declares that the commission shall have authority to inquire into the management and business of all carriers engaged in commerce between the states; that it shall keep itself informed as to the manner and method in which such business is conducted, and have the right to obtain from such carriers full and complete information necessary to enable it to perform its duties and accomplish the objects for which it was created; that it shall execute and enforce the provisions of the act; that upon its request it shall be the duty of any district attorney of the United States to institute in the proper court, and prosecute under the direction of the attorney general, all necessary proceedings for the enforcement of the act and for the punishment of all violations thereof; that it shall have power to require by subpoena the attendance and testimony of witnesses and the production of all books, papers, tariffs, contracts, agreements, and documents relating to any matter under investigation from any place in the United States at any designated place of hearing. The act further provides that, "in case of disobedience to a subpoena, the commission, or any party to a proceeding before the commission, may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of books, papers, and documents, under the provisions of this section. And any of the circuit courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any common carrier subject to the provisions of this act, or other person, issue an order requiring such carrier or other person to appear before said commission, (and produce books and papers, if so ordered,) and give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof."

The Interstate Commerce Commission is an administrative, and not a judicial, body, and the important question presented for determination is, can the process of this court be exercised in aid of an

investigation before such a tribunal? The jurisdiction of the courts of the United States is limited, and it is not competent for congress to confer upon them authority which is not strictly judicial, and clearly within the grant found in the third article of the constitution. The first section of that article declares that the judicial power of the United States shall be vested in one supreme court and such inferior courts as congress may from time to time establish; and the second section declares that the judicial power shall extend to all cases in law and equity arising under the constitution, the laws of the United States, and treaties made, or which shall be made, under their authority, to all cases affecting ambassadors, other public ministers and consuls, to all cases of admiralty and maritime jurisdiction, to controversies to which the United States shall be a party, etc. This grant of power was discussed in Osborn v. Bank, 9 Wheat. 738, and in delivering the opinion of the court Chief Justice Marshall said:

"This clause enables the judicial department to receive jurisdiction to the full extent of the constitution, laws, and treaties of the United States, when any question respecting them shall assume such a form that the judicial power is capable of acting upon it. That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law. It then becomes a case."

In Smith v. Adams, 130 U. S 167, 9 Sup. Ct. Rep. 566, this section was again considered, and in interpreting it the court said:

"By those terms are intended the claims or contentions of litigants brought before the courts for adjudication by regular proceedings established for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs. Whenever the claim or contention of a party takes such a form that the judicial power is capable of acting upon it, then it has become a case or controversy."

" The functions of the judges of the courts of the United States," said Judge Story, " are strictly and exclusively judicial. They cannot, therefore, be called upon to advise the president in any interpretation of law, or act as commissioners in case of pensions or other like proceedings." 2 Story, Const. § 1777.

The application of an administrative body (and we are now considering such an application) to a judicial tribunal for the exercise of its functions in aid of the execution of nonjudicial duties does not make a "case" or "controversy" upon which the judicial power can be brought to bear. It is not a contention between litigants, "brought before a court by regular proceedings for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs." The commission was engaged in investigating charges of unlawful discrimination against certain railroad companies, and this court is simply asked to aid that body in obtaining evidence which, it is claimed, will tend to support the charge. The subject of the inquiry is not brought here for adjudication, and this court can exercise no discretion beyond deciding whether the evidence demanded is pertinent to the charge, and within the general scope of the twelfth section of the act. Congress cannot make the judicial department the mere adjunct or instrument of either of the other departments of government. Hayburn's Case, 2 Dall. 409; Ferreira's Case, 13 How. 45; McLean's Case, 37 Fed. Rep. 648.

By an act of congress passed in 1887 the president was authorized to appoint three commissioners to examine the books, papers, and

method of business of all railroad companies which had received aid from the United States, for the purpose of ascertaining whether they had observed the obligations imposed upon them by law. The act gave the commissioners power to require the attendance and testimony of witnesses and the production of books, papers, and documents relating to any matter under investigation. It also provided "that any of the circuit or district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any person, issue an order requiring any such person to appear before said commissioners, or either of them, as the case may be, and to produce books and papers, if so ordered, and give evidence touching the matter in question; and any failure to obey such order of the court may be punished by said court as a contempt thereof." Three commissioners were accordingly appointed, and they cited before them Leland Stanford, president of the Central Pacific Railroad Company, one of the corporation which had received government aid, and propounded questions to him touching the administration of the affairs of his company, and the alleged dishonest disbursement of some of its moneys, which he refused to answer. He was also required to produce the books of his company, which he declined to do. The circuit court for the northern district of California was thereupon applied to for an order upon Stanford, to show cause why he should not be required to comply with the demands of the commissioners. Mr. Justice Field, Judge Sawyer, and Judge Sabin constituted the court which heard the motion, and they concurred in holding that it was not a case or controversy within the meaning of the constitution, and that the act under which the commissioners were appointed was unauthorized and void. In a carefully prepared opinion on the motion, Sawyer, Circuit Judge, said:

"The court is made the ministerial agent of the commission to perform its behests whenever a witness refuses to respond to a question or produce papers within the range of the authority attempted to be given by the statute. The judicial department of the government is simply made, by this act, an adjunct to the legislative department in the exercise of its political and legislative functions and powers, to execute its demands, and that, too, in a matter into which congress, under the decision cited, has no jurisdiction whatever to inquire. I know of no power in congress to thus render the judicial department subordinate or auxiliary to the legislative and executive departments of the government, or to either of them. If there is any one proposition immutably established I had supposed it to be that the judiciary department is absolutely independent of the other departments of the government, and that it cannot be called upon to act a part subordinate to any other department of the government." In re Pacific Railroad Com'rs, 32 Fed. Rep. 267.

Undoubtedly congress may confer upon a nonjudicial body authority to obtain information necessary for legitimate governmental purposes, and make refusal to appear and testify before it touching matters pertinent to any authorized inquiry an offense punishable by the courts, subject, however, to the privilege of witnesses to make no disclosures which might tend to criminate them, or subject them to penalties or forfeitures. A prosecution or an action for violation of such a statute would clearly be an original suit or controversy between parties within the meaning of the constitution, and not a mere application, like the present one, for the exercise of the judicial

power in aid of a nonjudicial body. So much of section 12 as authorizes or requires the courts to use their process in aid of inquiries before the Interstate Commerce Commission is unconstitutional and void, and the application is dismissed.