Ex parte RIEBELING.

(District Court, W. D. Texas, El Paso Division. October 25, 1895.)

CONSTITUTIONAL LAW — JUDICIAL POWER — CERTIFYING COMPENSATION OF INFORMER—ACT JUNE 22, 1874, § 6.

The provision in section 6 of the act of congress of June 22, 1874, that no payment shall be made to an informer furnishing information which leads to the seizure of smuggled goods in a case where judicial proceedings have been had, unless the value of his services shall have been certified by the court or judge for the information of the secretary of the treasury, who, however, shall not be bound by such certificate, is an attempt to confer upon the court or judge a power not judicial, which congress has no power, under the constitution, to require the judiciary to exercise; and, accordingly, the courts and judges are without jurisdiction to make such certificate.

T. T. Teel, for applicant.

MAXEY, District Judge. This is an application made by Max Riebeling, who claims compensation as an informer, for having given original information to the collector of customs of this port to the effect that 120 cans of opium which he pointed out to an inspector had been smuggled into the United States from the republic of Mexico. The information given by the applicant led to the seizure of the opium and the same was duly sold under a decree of the court, and the proceeds thereof deposited by the clerk of the court with the collector of customs, as the law requires.

The application presented by counsel for the applicant concludes with the following prayer or request:

"It is respectfully asked that this claim receive the consideration of this honorable court, and that it be allowed or approved by your honor, under the act of June 22, 1874 (18 Stat. 186), and that a certificate issue therefor, or such order as may be proper under the law."

It appears from the evidence submitted to the court that the claim for compensation was first presented to the treasury department, and by it returned for the action of the court, in obedience to section 6 of the act of congress to which reference has been made. By that section it is provided:

"Sec. 6. That no payment shall be made to any person furnishing information in any case wherein judicial proceedings shall have been instituted, un-

less his claim to compensation shall have been established to the satisfaction of the court or judge having cognizance of such proceedings, and the value of his services duly certified by said court or judge for the information of the secretary of the treasury; but no certificate of the value of such services shall be conclusive of the amount thereof." 1 Supp. Rev. St. (2d Ed.) p. 33.

It will be observed that the act confers no power upon the court to render judgment in favor of the informer for the amount which may be found due him. The court can make no order in respect of the claim of any efficacy whatever. Its duties are purely clerical, in that the statute requires the court or judge to certify the value of the informer's services, "for the information of the secretary of the treasury; but no certificate of the value of such services shall be conclusive of the amount thereof." It scarcely requires argument to demonstrate that, under our form of government, the power attempted to be conferred upon the court by the act in question is in no proper sense judicial power. The duty enjoined is not a judicial duty, but a mere direction to the court to ascertain and establish certain facts for the information of the secretary of the treasury; and the question for the court to determine is whether it has jurisdiction to proceed in accordance with the prayer of the applicant. After giving the subject careful consideration, the court has reached the conclusion that congress is without authority, under the constitution, to require the judiciary to discharge other than judicial functions, and hence that the present proceedings must be dismissed for the want of jurisdiction.

The question as to the character in which a judge acts, in a case somewhat similar to the one now under consideration is not a new one. It arose first in 1792, in Hayburn's Case, reported in 2 Dall. 409. "The act of 23d of March in that year," as explained by the supreme court, "required the circuit courts of the United States to examine into the claims of the officers and soldiers and seamen of the Revolution to the pensions granted to invalids by that act, and to determine the amount of pay that would be equivalent to the disability incurred, and to certify their opinion to the secretary of war. And it authorized the secretary, when he had cause to suspect imposition or mistake, to withhold the pension allowed by the court, and to report the case to congress at its next session. The authority was given to the circuit courts, and a question arose whether the power conferred was a judicial one, which the circuit courts, as such, could constitutionally exercise." U. S. v. Ferreira, 13 How. 49.

The act last above referred to is entitled "An act to provide for the settlement of the claims of widows and orphans barred by the limitations heretofore established, and regulate the claims to invalid pensions." This act was taken under consideration by several of the circuit courts, and their conclusions thereon will be found in the note appended to Hayburn's Case, 2 Dall. 409–415.

The circuit court for the district of New York (consisting of Mr. Chief Justice Jay and Mr. Justice Cushing and District Judge Duane) were unanimous in their opinion, and agreed:

"That, by the constitution of the United States, the government thereof is divided into three distinct and independent branches, and that it is the duty

of each to abstain from and to oppose encroachments on either. That neither the legislative nor the executive branches can constitutionally assign to the judicial any duties but such as are properly judicial, and to be performed in a judicial, manner. That the duties assigned to the circuit by this act are not of that description, and that the act itself does not appear to contemplate them as such, inasmuch as it subjects the decisions of these courts made pursuant to those duties first to the consideration and suspension of the secretary at war, and then to the revision of the legislature; whereas, by the constitution, neither the secretary at war, nor any other executive officer, nor even the legislature, is authorized to sit as a court of errors on the judicial acts or opinions of. this court. As, therefore, the business assigned to this court by the act is not judicial, nor directed to be performed judicially, the act can only be considered as appointing commissioners for the purposes mentioned in it, by official instead of personal description. That the judges of this court regard themselves as being the commissioners designated by the act, and therefore as being at liberty to accept or decline that office. That, as the objects of this act are exceedingly benevolent, and do real honor to the humanity and justice of congress, and as the judges desire to manifest, on all proper occasions and in every proper manner, their high respect for the national legislature, they will execute this act in the capacity of commissioners."

The circuit court for the district of Pennsylvania (consisting of Mr. Justice Wilson and Mr. Justice Blair and District Judge Peters) made the following representation in a letter jointly addressed to the president of the United States on the 18th day of April, 1792:

"To you it officially belongs to take care that the laws of the United States 'be faithfully executed.' Before you, therefore, we think it our duty to lay the sentiments which, on a late painful occasion, governed us with regard to an act passed by the legislature of the Union. The people of the United States have vested in congress all legislative powers granted in the constitution. They have vested in one supreme court, and in such inferior courts as the congress shall establish, 'the judicial power of the United States.' It is worthy of remark that in congress the whole legislative power of the United States is not vested. An important part of that power was exercised by the people themselves, when they 'ordained and established the constitution.' This constitution is 'the supreme law of the land.' This supreme law 'all judicial officers of the United States are bound, by oath or affirmation, to support.' It is a principle important to freedom that in government the judicial power should be distinct from and independent of the legislative department. To this important principle the people of the United States, in forming their constitution, have manifested their highest regard. They have placed their judicial power, not in congress, but in 'courts.' They have ordained that the 'judges of those courts shall hold their offices during good behavior,' and that, 'during their continuance in office, their salaries shall not be diminished.' Congress have lately passed an act to regulate, among other things, 'the claims to invalid pensions.' Upon due consideration, we have been unanimously of opinion that, under this act, the circuit court held for the Pennsylvania district could not proceed: (1) Because the business directed by this act is not of a judicial nature. It forms no part of the power vested by the constitution in the courts of the United States. The circuit court must, consequently, have proceeded without constitutional authority. (2) Because if, upon that business, the court had proceeded,. its judgments (for its opinions are its judgments) might, under the same act, have been revised and controlled by the legislature, and by an officer in the executive department. Such revision and control we deem radically inconsistent with the independence of that judicial power which is vested in the courts, and consequently with that important principle which is so strictly observed by the constitution of the United States. These, sir, are the reasons of our conduct. Be assured that, though it became necessary, it was far from being pleasant. To be obliged to act contrary either to the obvious directions of congress or to a constitutional principle, in our judgment equally obvious, excited feelings in us we hope never to experience again."

The circuit court for the district of North Carolina (consisting of Mr. Justice Iredell and District Judge Sitgreaves) made the following representation in a letter addressed to the president on the 8th of June, 1792:

"We, the judges now attending at the circuit court of the United States for the district of North Carolina, conceive it our duty to lay before you some important observations which have occurred to us in the consideration of an act of congress lately passed, entitled 'An act to provide for the settlement of the claims of widows and orphans barred by the limitations heretofore established, and to regulate the claims to invalid pensions.' We beg leave to premise that it is as much our inclination as it is our duty to receive with all possible respect every act of the legislature, and that we never can find ourselves in a more painful situation than to be obliged to object to the execution of any, more especially to the execution of one founded on the purest principles of humanity and justice, which the act in question undoubtedly is. But, however lamentable a difference in opinion really may be, or with whatever difficulty we may have formed an opinion, we are under the indispensable necessity of acting according to the best dictates of our own judgment, after duly weighing every consideration that can occur to us, which we have done on the present occasion. The extreme importance of the case, and our desire of being explicit beyond the danger of being misunderstood, will, we hope, justify us in stating our observations in a systematic manner. We, therefore, sir, submit to you the following: '(1) That the legislative, executive, and judicial departments are each formed in a separate and independent manner, and that the ultimate basis of each is the constitution only, within the limits of which each department can alone justify any act of authority. (2) That the legislature, among other important powers, unquestionably possess that of establishing courts in such a manner as to their wisdom shall appear best, limited by the terms of the constitution only; and to whatever extent that power may be exercised, or however severe the duty they may think proper to require, the judges, when appointed in virtue of any such establishment, owe implicit and unreserved obedience to it. (3) That, at the same time, such courts cannot be warranted, as we conceive, by virtue of that part of the constitution delegating judicial power, for the exercise of which any act of the legislature is provided, in exercising (even under the authority of another act) any power not in its nature judicial, or, if judicial, not provided for upon the terms the constitution requires. (4) That whatever doubt may be suggested whether the power in question is properly of a judicial nature, yet, inasmuch as the decision of the court is not made final, but may be at least suspended in its operation by the secretary at war, if he shall have cause to suspect imposition or mistake, this subjects the decision of the court to a mode of revision which we consider to be unwarranted by the constitution; for though congress may certainly establish, in instances not yet provided for, courts of appellate jurisdiction, yet such courts must consist of judges appointed in the manner the constitution requires, and holding their offices by no other tenure than that of their good behavior, by which tenure the office of secretary at war is not held. And we beg leave to add, with all due deference, that no decision of any court of the United States can, under any circumstances, in our opinion, agreeable to the constitution, be liable to a revision, or even suspension, by the legislature itself, in whom no judicial power of any kind appears to be vested but the important one relative to impeachments.' These, sir, are our reasons for being of opinion, as we are at present, that this circuit court cannot be justified in the execution of that part of the act which requires it to examine and report an opinion on the unfortunate cases of officers and soldiers disabled in the service of the United States. The part of the act requiring the court to sit five days for the purpose of receiving applications from such persons we shall deem it our duty to comply with; for, whether in our opinion such purpose can or cannot be answered, it is, as we conceive, our indispensable duty to keep open any court of which we have the honor to be judges, as long as congress shall direct."

The supreme court, in U. S. v. Ferreira, supra, referring to the views expressed by the circuit courts sitting in New York, Pennsylvania, and North Carolina, uses this language:

"These opinions, it appears by the report in 2 Dall. 409, were all communicated to the president; and the motion for a mandamus in Hayburn's Case, at the next term of the supreme court, would seem to have been made merely for the purpose of having it judicially determined in this court whether the judges, under that law, were authorized to act in the character of commissioners; for every judge of the court, except Thomas Johnson, whose opinion is not given, had formerly expressed his opinion in writing that the duty imposed, when the decision was subject to the revision of a secretary and of congress, could not be executed by the court as a judicial power; and the only question upon which there appears to have been any difference of opinion was whether it might not be construed as conferring the power on the judges personally as commissioners. And, if it would bear that construction, there seems to have been no doubt at that time but that they might constitutionally exercise it, and the secretary constitutionally revise their decisions. The law, however, was repealed at the next session of the legislature, and a different way provided for the relief of the pensioners; and the question as to the construction of the law was not decided in the supreme court. But the repeal of the act clearly shows that the president and congress acquiesced in the correctness of the decision that it was not a judicial power."

After delivering the opinion in U. S. v. Ferreira, the attention of the court was called to the case of U. S. v. Yale Todd, which arose under the act of 1792, and was decided by the supreme court in 1794. Todd's Case shows the opinion of the court upon the question which was left in doubt by the opinions of the different judges in the note to Hayburn's Case, and the chief justice appended, by order of the court, the following note to U. S. v. Ferreira, supra:

"Since the aforegoing opinion was delivered, the attention of the court has been drawn to the case of United States v. Yale Todd, which arose under the act of 1792, and was decided in the supreme court February 17, 1794. There was no official reporter at that time, and this case has not been printed. It shows the opinion of the court upon a question which was left in doubt by the opinions of the different judges stated in the note to Hayburn's Case. And as the subject is one of much interest, and concerns the nature and extent of judicial power, the substance of the decision in Yale Todd's Case is inserted here, in order that it may not be overlooked if similar questions should hereafter arise. The second, third, and fourth sections of the act of 1792 were repealed at the next session of congress by the act of February 28, 1793. It was these three sections that gave rise to the questions stated in the note to Hayburn's Case. The repealing act provided another mode for taking testimony and deciding upon the validity of claims to the pensions granted by the former law; and by the third section it saved all rights to pensions which might be founded 'upon any legal adjudication' under the act of 1792, and made it the duty of the secretary of war, in conjunction with the attorney general, to take such measures as might be necessary to obtain an adjudication of the supreme court, 'on the validity of such rights, claimed under the act aforesaid, by the determination of certain persons styling themselves commissioners.' It appears from this case that Chief Justice Jay and Justice Cushing acted upon their construction of the act of 1792, immediately after its passage, and before it was repealed. And the saving and proviso in the act of 1793 was manifestly occasioned by the difference of opinion upon that question which existed among the justices, and was introduced for the purpose of having it determined whether, under the act conferring the power upon the circuit courts, the judges of those courts, when refusing, for the reasons assigned by them, to act as courts, could legally act as commissioners out of court. If the decision of the judges as commissioners was a

legal adjudication, then the party's right to the pension allowed him was saved; otherwise, not. In pursuance of this act of congress, the Case of Yale Todd was brought before the supreme court, in an amicable action, and upon a case stated at February term, 1794. The case was docketed by consent, the United States being plaintiff, and Todd the defendant. The declaration was for one hundred and seventy-two dollars and ninety-one cents, for so much money had and received by the defendant to the use of the United States, to which the defendant pleaded non assumpsit. The case as stated admitted that on the 3d of May, 1792, the defendant appeared before the Hon. John Jay, William Cushing, and Richard Law, then being judges of the circuit court held at New Haven, for the district of Connecticut, then and there sitting, and claiming to be commissioners under the act of 1792, and exhibited the vouchers and testimony to show his right under that law to be placed on the pension list; and that the judges above named, being judges of the circuit court, and then and there sitting at New Haven, in and for the Connecticut district, proceeded, as commissioners designated in the said act of congress, to take the testimony offered by Todd, which is set out at large in the statement, together with their opinion that Todd ought to be placed on the pension list, and paid at the rate of two-thirds of his former monthly wages, which they understood to have been eight dollars and one-third per month, and the sum of one hundred and fifty dollars for arrears. The case further admits that the certificate of their proceedings and opinions, and the testimony they had taken, were afterwards, on the 5th of May, 1792, transmitted to the secretary of war, and that, by means thereof, Todd was placed on the pension list, and had received from the United States one hundred and fifty dollars for arrears, and twenty-two dollars and ninety-one cents claimed for his pension aforesaid, said to be due on the 2d of September, 1792. And the parties agreed that if, upon this statement, the said judges of the circuit court, sitting as commissioners, and not as a circuit court, had power and authority, by virtue of said act, so to order and adjudge of and concerning the premises, that then judgment should be given for the defendant, otherwise for the United States, for one hundred and seventy-two dollars and ninety-one cents, and six cents costs. The case was argued by Bradford, attorney general for the United States, and Hillhouse, for the defendant; and the judgment of the court was rendered in favor of the United States for the sum above mentioned. Chief Justice Jay and Justices Cushing, Wilson, Blair, and Paterson were present at the decision. No opinion was filed stating the grounds of the decision; nor is any dissent from the judgment entered on the record. It would seem, therefore, to have been unanimous, and that Chief Justice Jay and Justice Cushing became satisfied, on further reflection, that the power given in the act of 1792 to the circuit court as a court could not be construed to give it to the judges out of court as commissioners. It must be admitted that the justice of the claims and the meritorious character of the claimants would appear to have exercised some influence on their judgments in the first instance, and to have led them to give a construction to the law which its language would hardly justify upon the most liberal rules of interpretation. The result of the opinions expressed by the judges of the supreme court of that day in the note to Hayburn's Case, and in the case of U. S. v. Todd, is this: (1) That the power proposed to be conferred on the circuit courts of the United States by the act of 1792 was not judicial power, within the meaning of the constitution, and was therefore unconstitutional, and could not lawfully be exercised by the courts. (2) That, as the act of congress intended to confer the power on the courts as a judicial function, it could not be construed as an authority to the judges composing the court to exercise the power out of court in the character of commissioners. (3) That money paid under a certificate from persons not authorized by law to give it might be recovered back by the United States."

It has been deemed eminently proper, in consideration of the extreme importance of the principle involved, to quote in extenso from the views of the distinguished jurists who passed upon the questions decided in the note to Hayburn's Case. Whether sound

or unsound, the decision in those cases is binding upon all national judicial tribunals; but, so far as this court may be interested in the question, it does not hesitate to say that, in its judgment, the reasoning of the eminent judges is absolutely unanswerable.

Ferreira's Case, supra, was taken by appeal to the supreme court from the United States district court for the Northern district of Florida. That case is stated in the following language of the supreme court:

"The case brought before the court is this: The treaty of 1819, by which Spain ceded Florida to the United States, contains the following stipulation in the ninth article: 'The United States shall cause satisfaction to be made for the injuries, if any, which by process of law shall be established to have been suffered by the Spanish officers and individual Spanish inhabitants by the late operations of the American army in Florida.' In 1823, congress passed an act to carry into execution this article of the treaty. The first section of this law authorizes the judges of the superior courts established at St. Augustine and Pensacola, respectively, to receive and adjust all claims arising within their respective jurisdictions, agreeably to the provisions of the article of the treaty above mentioned; and the second section provides that, in all cases where the judges shall decide in favor of the claimants, the decisions, with the evidence on which they are founded, shall be by the said judges reported to the secretary of the treasury, who, on being satisfied that the same is just and equitable, within the provisions of the treaty, shall pay the amount thereof to the person or persons in whose favor the same is adjudged."

The appeal was dismissed by the court; and, in the discussion of the case, it is said by Mr. Chief Justice Taney, as the organ of the court, that:

"The law of 1823, therefore, and not the stipulations of the treaty, furnishes the rule for the proceeding of the territorial judges, and determines their character. And it is manifest that this power to decide upon the validity of these claims is not conferred on them as a judicial function, to be exercised in the ordinary forms of a court of justice,—for there is to be no suit; no parties, in the legal acceptance of the term, are to be made; no process to issue; and no one is authorized to appear on behalf of the United States, or to summon witnesses in the case. The proceeding is altogether ex parte; and all that the judge is required to do is to receive the claim when the party presents it, and to adjust it upon such evidence as he may have before him or be able himself to obtain. But neither the evidence nor his award are to be filed in the court in which he presides, nor recorded there; but he is required to transmit both the decision and the evidence upon which he decided to the secretary of the treasury, and the claim is to be paid if the secretary thinks it is just and equitable, but not otherwise. It is to be a debt from the United States upon the decision of the secretary, but not upon that of the judge. It is too evident for argument on the subject that such a tribunal is not a judicial one, and that the act of congress did not intend to make it one. The authority conferred on the respective judges was nothing more than that of a commissioner to adjust certain claims against the United States; and the office of judges, and their respective jurisdictions, are referred to in the law merely as a designation of the persons to whom the authority is confided, and the territorial limits to which it extends. The decision is not the judgment of a court of justice. It is the award of a commissioner. The act of 1834 calls it an 'award.' And an appeal to this court from such a decision, by such an authority, from the judgment of a court of record, would be an anomaly in the history of jurisprudence. An appeal might as well have been taken from the awards of the board of commissioners, under the Mexican treaty, who were recently sitting in this city."

The statute which the applicant, Riebeling, invokes in support of his claim, was passed upon by Judge Treat in Ex parte Gans, 17 Fed.

471. The Case of Gans is in all essential respects similar to the case before the court. The applicant, Gans, as an informer, claimed, as does Riebeling, compensation from the government for original information given in a smuggling case. That case, as was the case here, had been disposed of, and the proceeds of the condemned property paid into the treasury of the United States, prior to the filing of the application for compensation. Discussing the statute, Judge Treat observed:

"What, then, is the supposed function of the court? If to be reviewed by the secretary of the treasury, its action is not judicial; and only judicial functions can be devolved on its constitutionality [it constitutionally]. The persons who happen to be judges may be named for other than judicial duties eis nominibus or ex officiis; but it will then be for them to determine, each for himself, whether he will accept the new office or position. The United States supreme court, as early as 1794, passed upon this general subject, and its early decisions were reviewed and affirmed in U. S. v. Ferreira, 13 How. 40. The act of 1874 presents several anomalies in this respect. If the decision as to informers is committed solely to the discretion of the secretary, the duty to decide is purely executive, and the information upon which he is to act should come from executive sources. Section 6 provides that, where no judicial proceedings are had, the secretary shall require satisfactory proofs; but, where such proceedings shall have been instituted, he must, before payment, have the certificate of the court, by which, however, he is not bound as to compensation awarded. This provision may be intended as a check on the secretary, but what function does the court perform? These suggestions are made for the purpose of directing attention to the anomaly of confounding or confusing judicial and executive functions. Whether the decree of a court as to an informer's rights, when made in a pending case, could or could not be enforced, need not be decided."

It is not quite clear upon what distinct ground the learned judge relied in dismissing the petition pending before him, but the inference is clearly deducible that he acted upon two: (1) That the duty imposed upon the courts by the statute was extrajudicial; and (2) the application was not cognizable by him after the principal case had been disposed of and the proceeds of the condemned property paid into the treasury. His opinion concludes with these words:

"Whatever view may be taken of the subject, there are so many anomalies connected with this application that the court must decline to entertain and act upon the petition presented. If the petitioner seeks a review of the order of this court, dismissing the petition for want of jurisdiction, a direct and practical test will occur, viz. whether the appellate court has jurisdiction, or whether, on the other hand, the application is nonjudicial, and consequently not cognizable by the court as such."

As to the present application the court reserves any expression of opinion upon the question whether it has power to consider the application after the final disposition of the principal case, and the payment over by the clerk of the proceeds of the condemned property to the official authorized to receive it. But, upon the other and more important question, the court is clearly of opinion that under section 6 of the act of June 22, 1874, no judicial duty is required to be performed by, and no judicial power is conferred upon, it, and hence the court is without jurisdiction to act in the premises. The duty attempted to be imposed by section 6 upon the courts is simply clerical in its nature, which may be as conveniently and efficiently

discharged by any competent member of the executive department. The application should be dismissed for want of jurisdiction, and it is so ordered.