# Appointments to the Commission on the Bicentennial of the Constitution

Presidential appointment of the Chief Justice of the United States to the Commission on the Bicentennial of the Constitution is consistent with the Appointments Clause, art. II, § 2, cl. 2, and, as applied to the unique circumstances of this Commission, with general separation of powers principles.

In addition, participation of the Chief Justice on the Commission would appear to be permissible under the Code of Judicial Conduct.

Members of Congress may participate on the Commission without violating the Appointments Clause or the Incompatibility Clause, art. I, § 6, cl. 2, if the Commission creates an executive committee to discharge the purely executive functions of the Commission, or if the non-congressional members determine that the Commission will not act unless a full majority, including the congressional members, approve.

August 31, 1984

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

Some time ago we discussed whether there was some practical means for resolving the legal disputes that have arisen concerning the Commission on the Bicentennial of the Constitution. You suggested that we consider the matter and put any thoughts we might have in a memorandum to you. This follows through on that discussion.

## I. Introduction

On September 29, 1983, the President signed S. 118, a bill that established the Commission on the Bicentennial of the Constitution (Commission). The statute authorized the Commission to plan and coordinate activities to celebrate the bicentennial of the Constitution and specifically included within the Commission's powers, in addition to the generally advisory functions, certain clearly executive functions, such as carrying out a limited number of commemorative events and projects and the adoption of binding regulations governing use of the Commission's logo. The statute vests the appointment of most of the members of the Commission in the President, but it also specifically designates as members, the Chief Justice of the Supreme Court, the President *pro tempore* of the Senate, and the Speaker of the House of Representatives. Because the members of the Commission are authorized to perform executive duties that may be performed only by Officers of the United States, this Office

concluded that the statutory designations were improper under the Incompatibility and Appointments Clauses of the Constitution. This position is one that has been taken by President Reagan and many of his predecessors on innumerable occasions under similar circumstances. Moreover, in an analogous context, the Senate Judiciary Committee recently expressed its appreciation for, and agreement with, our Appointments Clause objections to legislation that purports to vest in Congress the power to designate persons to serve on a commission that is given Executive functions:

> The Appointments Clause requires that individuals with executive responsibilities must be appointed by the President with the advice and consent of the Senate, or if authorized by Congress, by the President alone, the courts or the heads of departments. *Buckley* v. *Valeo*, 424 U.S. 1, 124–41 (1976). Inasmuch as the Committee intended the Commission to initiate and conduct commemorative activities, and to avoid any constitutional questions, the Committee has amended S. 500 to give the President full authority over all appointments. This will ensure that the Commissioners will be appointed in accordance with the Constitution and remove any doubt about the Commission's ability to plan, sponsor, and conduct such activities as it deems appropriate.

S. Rep. No. 194, 98th Cong., 1st Sess. 2 (1983) (referring to the Commission charged with planning, encouraging, coordinating, and conducting the Christopher Columbus Quincentenary Jubilee).

In a statement he issued at the time he signed S. 118, the President articulated the constitutional conclusions that had been raised by this Office:

> I welcome the participation of the Chief Justice, the President Pro Tempore of the Senate, and the Speaker of the House of Representatives in the activities of the Commission. However, because of the constitutional impediments contained in the Doctrine of the Separation of Powers, I understand that they will be able to participate only in ceremonial or advisory functions of the Commission, and not in matters involving the administration of the Act. Also, in view of the Incompatibility Clause of the Constitution, any Member of Congress appointed by me pursuant to Section 4(a)(1) of this Act may serve only in a ceremonial or advisory capacity.

> I also understand that this Act does not purport to restrict my ultimate responsibility as President for the selection and appointment of Members of the Commission, under Article 2, Section 2, Clause 2, of the Constitution.

Senator Hatch apparently disagreed with the legal conclusions contained in the President's signing statement and asked the Congressional Research Service

(CRS) to review the President's objections to the structure of the Commission. The CRS memorandum supported, to a certain extent, the viewpoint of Senator Hatch. Senator Hatch forwarded that memorandum both to Edwin Meese, III, Counselor to the President, and to the Attorney General. This Office prepared a response to the CRS memorandum (which we have previously sent to you) in which we reviewed the issues raised by the CRS and concluded that our original opinion with respect to the Commission was correct and that the CRS memorandum was in error.

The establishment of the Commission has remained a controversial issue, and the President has not yet appointed the members of the Commission. A conflict continues to persist between what we believe to be the clear requirements of the Constitution and the understandable desires of certain members of the Legislative and Judicial Branches to participate in the commemoration of the document that created all three branches of government.

This memorandum suggests some potential practical means for resolving the conflict. First, the memorandum considers the legality of the President appointing the Chief Justice as a member of the Commission. If such an appointment were permissible, the Appointments Clause problems arising from Congress' attempt to make the appointment might be avoided, and the Chief Justice might then be eligible to participate in all aspects of the Commission's activities, including those of an executive nature. Second, we make some suggestions concerning how the Commission might be structured in order to avoid the Incompatibility and Appointments Clause problems with respect to potential congressional members of the Commission.

## II. Presidential Appointment of the Chief Justice to the Commission

### A. Constitutional Considerations

#### 1. The Appointments Clause

It seems apparent that there would be no Appointments Clause problems if the President himself appointed the Chief Justice as one of the regular members of the Commission. Even if, as we have concluded, members of the Commission are Officers of the United States who must be appointed pursuant to the Appointments Clause, a direct Presidential appointment would satisfy the requirements of that Clause. The Appointments Clause contains no direct prohibitions against the appointment of any particular individuals to serve as Officers of the United States; it simply requires a certain procedure for appointing such Officers. See U.S. Const. art. II, § 2, cl. 2. Presidential appointment of the Chief Justice would satisfy this procedure.[1]

---

[1] The Incompatibility Clause would present no problem with respect to Presidential appointment of the Chief Justice. By its express terms, the Incompatibility Clause applies only to Members of Congress. See U.S. Const. art. I, § 6, cl. 2. Thus, under the principle that *expressio unius est exclusio alterius*, the absence of any reference to the judiciary in the Incompatibility Clause suggests that there is no absolute constitutional bar to the appointment of judges to positions that may be filled only by Officers of the United States.

202

## 2. The Separation of Powers

Although the Appointments Clause would not bar appointment of the Chief Justice in this instance, the more general principles of the separation of powers may have more relevance to this issue. In this context, the basic separation of powers issue is whether appointment of the Chief Justice to an Executive Branch position would disrupt the separation of functions that the Framers intended to build into the structure of the federal government. The separation of powers doctrine generally requires a careful balancing of the potential impact of a given action on the constitutional powers of each branch. *See, e.g., Nixon* v. *Administrator of General Services*, 433 U.S. 425 (1977).

With respect to the issue of performance of executive functions by a judge, the Supreme Court has made it clear that Congress may not require a court to perform nonjudicial functions. In *Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792), the Supreme Court appended to its decision an opinion of Chief Justice Jay, Justice Cushing, and a district judge sitting as a circuit court, in which they made the following findings in ruling that Congress could not assign nonjudicial duties to courts:

> That by the Constitution of the United States, the government thereof is divided into *three* distinct and independent branches, and that it is the duty of each to abstain from, and to oppose, encroachments on either.

> That neither the *Legislative* nor the *Executive* branches, can constitutionally assign to the *Judicial* any duties, but such as are properly judicial, and to be performed in a judicial manner.

2 U.S. (2 Dall.) at 410 n.*. This decision has subsequently been recognized by the Supreme Court as establishing the principle that courts could not be required to perform nonjudicial functions that would then be subject to review and revision by the Executive or Legislative Branches. *See Muskrat* v. *United States*, 219 U.S. 346, 352 (1911); *United States* v. *Ferreira*, 54 U.S. 40, 50–51 (1851).

This principle is not implicated in this matter, however, because the Chief Justice would not be required to perform nonjudicial functions, but rather would voluntarily accept an appointment to a nonjudicial office. Moreover, the Chief Justice would not be performing executive functions in his role as a judge, but rather would be holding two separate appointments, one of which was judicial, the other, executive. Thus, the issue is whether the Chief Justice may voluntarily accept this additional appointment.

Although, as far as we know, no court has ever ruled on this question, the Attorney General has on several occasions issued opinions upholding the right of the President to appoint members of the judicial branch to other government positions. *See* 40 Op. Att'y Gen. 423 (1945); 22 Op. Att'y Gen. 184 (1898). In the former instance, Attorney General Clark concluded that a judge of the

203

United States Court of Appeals could continue in that position while serving at the request of the President, and without compensation, as an alternate judicial member of the International Military Tribunal established for the trial of persons charged with war crimes. Attorney General Clark concluded:

> There is no express prohibition against Federal judges performing other services of a general character for the Federal Government. On the contrary, it is a well established practice for the President to secure the services of Federal judges in connection with various matters. The practice arose along ago. Chief Justice Jay served as special envoy to England at the request of the President . . . and Chief Justice Fuller twice acted as an arbitrator of international disputes . . . .

40 Op. Att'y Gen. at 424. Although none of the examples cited and approved by the Attorney General involved the performance by judges of executive duties that may be performed only by an Officer of the United States, there are examples of such appointments, particularly during World War II when, for example, Judge John C. Collet served as Director of Economic Stabilization. *See* 32 A.B.A. J. 682 (1946). In addition, judges have frequently undertaken diplomatic missions, and during this Administration, Chief Judge Irving R. Kaufman of the United States Court of Appeals for the Second Circuit was appointed to serve as Chairman of the President's Commission on Organized Crime.

Such actions have not, however, gone uncriticized. In 1947, the Senate Judiciary Committee issued a report that questioned the propriety of appointing members of the judiciary to nonjudicial posts. S. Exec. Rep. No. 7, 80th Cong., 1st Sess. (1947) (*reprinted in* 33 A.B.A. J. 792 (1947)). The Committee raised the following general objection:

> If it becomes common to expect Executive appointments, judges may slip into that frame of mind which seeks promotional opportunity at the hand of the Executive and the quality of the judicial character may be impaired. This could take on an ugly political tinge if judges came to see in the Executive appointment a chance to advance themselves politically or a chance to aid the Chief Executive politically.

33 A.B.A. J. at 793. The Committee went on to list a series of specific problems that might result from appointment of judges to executive positions:

> 1. Reward may be conferred or expected in the form of elevation to a higher judicial post.

> 2. The judicial and Executive functions may be improperly merged.

> 3. The absence of the judge from his regular duties increases the workload of the other judges of the Court, if any, and may result in an impairment of judicial efficiency in the disposition of cases.

4. Nonjudicial activities may produce dissension or criticism and may be destructive of the prestige and respect of the federal judiciary.

5. A judge, upon resumption of his regular duties, may be called upon to justify or defend his activity under an Executive commission.

*Id.* at 795. We believe that these are appropriate factors to be evaluated in assessing the impact of an appointment on the constitutionally prescribed separation of powers.

In this particular case, consideration of these factors supports the conclusion that appointment of the Chief Justice (or other members of the judiciary) to the Commission on the Bicentennial of the Constitution would not be inconsistent with separation of powers principles. First, given the position of the Chief Justice and the nature of this particular Commission, the appointment would not generally be regarded as a reward or, conversely, further reward would not be expected as a result of service on the Commission. Second, because the executive functions of the Commission are relatively insubstantial, there seems little danger of improperly merging the judicial and executive functions. Third, the work of the Commission is unlikely to draw the Chief Justice's attention away from the duties of his work on the Court to any material extent. Fourth, the relatively noncontroversial responsibilities of the Commission are unlikely to create dissension or criticism that would affect the prestige of the Court or the federal judiciary. Fifth, the Commission's activities are unlikely to result in actions that would later be subject to review by the Court. Finally, a Commission to plan the celebration of the two- hundredth anniversary of the Constitution is an entity that seems peculiarly suited to some participation by representatives of all three branches of government and is less likely than other types of entities to be considered a broad precedent.

An analysis of these factors therefore suggests that the appointment would not be inconsistent with the Constitution. Nevertheless, the general concerns that underlie the constitutional issue are significant enough to raise serious policy questions concerning the appropriateness of judicial appointments to executive positions in other circumstances. The considerations suggested by the Senate report are legitimate; the appointment of judges to Executive Branch positions is generally not a prudent policy. Thus, even though this particular appointment may be entirely appropriate, there is some risk that this appointment would be cited in some quarters as a precedent for future appointments with respect to which the problems may be greater.

## B. Statutory Questions

The only statutory issue that might be raised by the appointment of a judge to an additional position in the federal government would involve the Dual Compensation Act, 5 U.S.C. § 5533, which prohibits a person from receiving

compensation for more than one position with the federal government. In this case, however, because membership on the Commission involves no remuneration, no problem exists under this particular statute.

## C. The Code of Judicial Conduct

Canon 5(G) of the Code of Judicial Conduct for United States Judges is also relevant to the issue discussed in this memorandum. The Canon states:

> *Extra-judicial Appointments.* A judge should not accept appointment to a governmental committee, commission, or other position that is concerned with issues of fact or policy on matters other than the improvement of the law, the legal system, or the administration of justice, unless appointment of a judge is required by Act of Congress. A judge should not, in any event, accept such an appointment if his governmental duties would interfere with the performance of his judicial duties or tend to undermine the public confidence in the integrity, impartiality, or independence of the judiciary. A judge may represent his country, state, or locality on ceremonial occasions or in connection with historical, educational, and cultural activities.

The Code was adopted by the Judicial Conference of the United States in 1973. It is interpreted for the judiciary by the Advisory Committee on Judicial Activities. As we have stated before, in view of the existence of this Committee, and in view of the autonomy of the judiciary in matters concerning the propriety of judicial conduct, this Office cannot issue authoritative pronouncements concerning the applicability of the Code in the circumstances presented by this case. Nevertheless, we can offer our views with respect to what we perceive to be the apparent meaning of this provision.

We believe that participation of the Chief Justice on the Commission of the Bicentennial of the Constitution would not be inconsistent with Canon 5(G). First, it seems clear that the Commission's activities, because they involve celebration of, and education regarding, our fundamental legal charter, relate to a certain extent to "the legal system" and the "administration of justice." Moreover, participation on the Commission also seems to involve representation of the country "in connection with historical, educational, and cultural activities." In addition, participation on the Commission is unlikely to impose significant time demands on the Chief Justice or to involve the Court in an "extra-judicial matter that may prove to be controversial," which are the principal concerns underlying the Canon. *See* Commentary to Canon 5(G). Finally, full participation in the executive functions of the Commission would pose no greater problems with respect to Canon 5(G) than would participation as an advisory member, which the President interpreted the statute to mandate. Therefore, we believe that the President's appointment of the Chief Justice to the Commission would not pose a problem under Canon 5(G).

## D. Conclusion

In sum, we believe that there are no legal obstacles to Presidential appointment of the Chief Justice to the Commission. Such an appointment would be permissible under the Constitution, current statutory law, and, at least as we read it, the Code of Judicial Conduct.

## III. Practical Solutions to the Incompatibility Clause Problem

We have also explored the possibility of various structural arrangements within the Commission that might be designed to respect the Incompatibility Clause requirements of the Constitution,[2] but at the same time enable congressional members of the Commission to play a significant role in the Commission's work. We have two general suggestions, both of which involve significant and meaningful participation by congressional members, but in a technical advisory capacity.

### A. Establishment of an Executive Committee to Handle Executive Duties

The Commission might wish to create an executive committee composed of all non-advisory members of the Commission that would be legally responsible for discharging the purely executive functions of the Commission. These functions would include official approval of any binding regulations, signing legal instruments, and the technical responsibility for implementation of the commemorative events that the Commission is authorized to undertake itself. The full Commission would conduct meetings and do all the other things contemplated for the Commission, and the executive committee could finally approve all executive actions. This approach would separate the purely executive functions from the advisory functions that the Commission will perform and would allow all members of the Commission to participate in nearly all of the Commission's activities, including the formulation of programs that would be technically approved and executed by non-congressional members.

### B. Establishment of a Special Advisory Committee to the Commission

The Commission, without the congressional members voting, could decide that it would not act unless a full majority of the Commission, including the congressional members, approved. Technically the non-congressional members, i.e., those who were "officers" of the United States, could also reverse a Commission decision reached in this way, but we suspect such a contingency would be extremely unlikely.

---

[2] A similar problem is raised by the Ineligibility Clause, which provides in part that no "Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been increased during such time." U.S. Const. art. I, § 6, cl. 2.

Both of these concepts are quite general and the details would have to be more fully developed. There may be problems that we have not anticipated, but we think that both of the above proposals could be implemented in such a way so as to resolve the technical legal problems with respect to establishment of the Commission. In fact, some combination of the alternatives could be considered which would accommodate the interests, enthusiasm, expertise, and support from the congressional members without contravening the Incompatibility Clause.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*