**NATIONAL TREASURY EMPLOYEES UNION, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

**No. 92–1161.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 11, 1994.

Decided Aug. 5, 1994.

---

Barbara A. Atkin, Washington, DC, argued the cause for petitioners. With her on the briefs was Gregory O'Duden, Washington, DC.

Arthur A. Horowitz, Associate Sol., FLRA, Washington, DC, argued the cause for respondent. With him on the brief were David M. Smith, Sol., Federal Labor Relations Board Authority and Pamela P. Johnson, Atty., FLRA, Washington, DC, William Tobey, Deputy Sol., FLRA and William E. Persina, Sr. Atty., FLRA, Washington, DC.

Before: WILLIAMS, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Dissenting opinion filed by Circuit Judge SENTELLE.

STEPHEN F. WILLIAMS, Circuit Judge:

The National Treasury Employees Union represents employees within the Bureau of Alcohol, Tobacco and Firearms ("BATF"). In seeking to arrive at a new collective bargaining agreement for these employees, the union submitted a number of proposals to the agency. BATF declared some of them nonnegotiable, and the union sought review from the Federal Labor Relations Authority ("FLRA"). Ultimately, the FLRA found four of the six proposals before it negotiable. The union petitions for review of the FLRA's disposition of one of the two found nonnegotiable. Because we reject the FLRA's reason for finding nonnegotiability, we set its determination aside and remand for further proceedings.

I.

Under the Federal Service Labor–Management Relations Statute, 5 U.S.C. §§ 7101–35, most employees of executive-branch agencies have the right to unionize and to engage in collective bargaining. 5 U.S.C. § 7102. Agencies and their employees' unions have a duty to bargain in good faith over many matters, but they need not bargain over proposals to the extent that those proposals are "inconsistent with ... any Government-wide rule or regulation". Id. § 7117(a)(1). In the case at hand, the FLRA decided that the union's proposal—which would establish certain minimum levels for cash performance awards—conflicted with a government-wide regulation promulgated by the Office of Personnel Management ("OPM").

Some background is necessary to understand the union's proposal. By statute, most executive agencies are required to devise "performance appraisal systems" to assess the job performance of their employees. 5 U.S.C. § 4302(a). Except when special circumstances warrant a longer appraisal period, OPM's implementing regulations call for employees to receive an annual "rating of record", see 5 CFR § 430.205(a), which includes a "summary rating level" as well as a written appraisal of the employees' performance on various aspects of their jobs. Id. § 430.203. For General Schedule employees, agencies must establish at least three and no more than five "summary rating levels". 5 CFR § 430.204(h). The mandatory levels are labeled "Unacceptable" (level 1), "Fully Successful" (level 3), and "Outstanding" (level 5), id.; BATF apparently has also chosen to create an intermediate category labeled "Exceeds Fully Successful" (level 4).

Among other things, an employee's summary rating level determines his eligibility for a cash performance award. Congress has authorized agencies to give such awards to employees whose most recent performance rating was "Fully Successful" or better. 5 U.S.C. § 4505a(a)(1). OPM's implementing regulations also specify that performance awards "shall be based on the employee's rating of record for the current appraisal

period for which performance awards are being paid". 5 CFR § 430.503(b).

In the proposal under review, the union asked BATF to surrender a considerable amount of its discretion over awards. The proposal reads as follows:

A. All employees averaging Fully Successful in their annual appraisals shall get a $250.00 award, at a minimum.

B. All employees averaging Exceeds Fully Successful in their annual appraisals shall get a $500.00 award, at a minimum.

C. All employees averaging Outstanding in their annual appraisals shall get a $1,000.00 award, at a minimum.

D. If any employee receives a reduction in his/her annual appraisal as a result of conformance with this section, he/she will be eligible to receive the withheld awards as a remedy, as well as having the performance appraisal raised. If any pay was lost due to this incorrectly lowered appraisal, the employer will be liable for a backpay action.

E. The awards are subject to availability of funds in the Bureau's awards budget.

BATF advanced a variety of reasons for declaring this proposal nonnegotiable, but the FLRA based its decision entirely on the view that the proposal conflicted with 5 CFR § 430.504(d), a regulation promulgated by OPM pursuant to its statutory authority. See 5 U.S.C. §§ 4305, 4506. According to this regulation, "The decision to grant a performance award, including the amount of such award, shall be reviewed and approved by an official of the agency who is at a higher level than the official who made the initial decision, unless there is no official at a higher level in the agency."

In two 1988 cases, the FLRA had held that the precursor of this regulation, 5 CFR § 430.503(c)(1) (1988), did not conflict with proposals similar to the one before us. See *National Treasury Employees Union, Chapter 245, and Department of Commerce, Patent & Trademark Office,* 30 FLRA 1219, 1222 (1988); *National Association of Government Employees, Locals R4–26 and R4–106, and Department of the Air Force, Langley Air Force Base, Virginia,* 32 FLRA 607,

610–11 (1988). But the Fourth Circuit, in an unpublished decision, refused to enforce the second of the two orders. As an alternative ground for its holding, it asserted that "[t]he mandatory nature of the awards proposals negates giving any efficacy" to the higher-level review contemplated by OPM's regulation. *Department of the Air Force v. FLRA,* No. 88–2171, 1989 WL 74869 (4th Cir. July 3, 1989). Taking its cue from this ruling, the FLRA subsequently agreed that the review-and-approval process required by the OPM regulation "inherently encompasses the authority to review and *disapprove*" performance awards in their entirety. *Tidewater, Virginia, Federal Employees Metal Trades Council and U.S. Dep't of the Navy, Norfolk Naval Shipyard, Portsmouth, Virginia,* 37 FLRA 938, 950 (1990) (emphasis added).

Shortly after OPM promulgated the current regulation, see 56 Fed.Reg. 20331 (May 3, 1991) (codified at 5 CFR § 430.504(d)), the FLRA decided that the rationale of *Norfolk Naval Shipyard* was equally applicable to it. *National Treasury Employees Union and United States Dep't of Commerce, Patent & Trademark Office,* 41 FLRA 1349, 1361 (1991), aff'd on other grounds sub nom. *National Treasury Employees Union v. FLRA,* No. 91–1262, 1992 WL 55757 (D.C.Cir. Mar. 20, 1992) (Mem.Op.). And the FLRA adhered to *Norfolk Naval Shipyard* in the present case too. Even if the union's proposal preserves the ability of reviewing officials to disapprove performance awards for budgetary reasons, the FLRA stressed that it deprives them of the ability to disapprove such awards (or reduce them below the specified thresholds) for any other reasons. The FLRA decided that these constraints on the reviewing power were inconsistent with the implicit requirements of § 430.504(d), and that the union's proposal was therefore nonnegotiable.

## II.

In light of statutory mechanisms that might under some circumstances curtail the effect of our judgment, we raised on our own the question of whether we have jurisdiction and invited briefs from the parties. OPM has statutory authority to review agencies'

"performance appraisal systems"—which include their mechanisms for "us[ing] the results of performance appraisals as a basis for ... rewarding ... employees", 5 U.S.C. § 4302(a)(3)—for compliance with certain statutory and regulatory requirements, *id.* § 4302(b)(1). If OPM finds a violation, it "shall direct the agency to implement an appropriate system ..., and any such agency shall take any action so required". *Id.* § 4304(b)(3). OPM's regulations accordingly call for agency heads to submit their performance-awards plans, as well as certain modifications of those plans, for OPM's approval. 5 CFR §§ 430.103, 430.505, 430.506. The parties agree that if BATF were to accept the union's proposal here, the resulting agreement would be subject to OPM's review. As a general matter, the parties also agree that if OPM saw a conflict between such a plan and § 430.504(d), it could disapprove the plan. There is thus the possibility that if we find the union's proposal consistent with § 430.504(d), and if the parties adopt the union's proposal or one substantially similar to it, OPM would confront a legal question quite similar to the one now before us: is the union's proposal (embodied in BATF's performance-awards plan) consistent with § 430.504(d)?

■ The prospect of that later OPM decision suggested a possible conflict with the rule that judgments merely recommending action to the executive branch are only advisory opinions and thus beyond the authority of Article III courts. In the age before administrative agencies, Congress sometimes attempted to enlist the federal courts in such projects. In both *United States v. Ferreira,* 54 U.S. (13 How.) 40, 14 L.Ed. 40 (1851), and *Hayburn's Case,* 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792), the statutory scheme called upon the courts to make mere recommendations about whether the government should pay certain claims; payment was required only if these recommendations were then approved by reviewing officials in the executive branch. The Supreme Court in *Ferreira,* and the various circuit courts whose positions are reported in *Hayburn's Case,* quite properly concluded that this task was beyond the judicial power. The Court reached the same conclusion in *Chicago & Southern Air Lines v. Waterman Steamship Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), holding that Congress cannot call upon the federal courts to review an agency's tentative recommendations before their transmission to the President, when the President would be free to "completely disregard the judgment of the court", *id.* at 113, 68 S.Ct. at 437, and to accept or reject those recommendations as his political judgment dictated, *id.* All these cases, then, stand for the same proposition: a federal court is not presented with a justiciable case or controversy when its decision would go into effect only upon the approval of a reviewing official in the executive-branch.

■ In two important respects, however, such cases are distinguishable from the present context. First, our judgment, unless reversed by higher judicial authority, will conclusively determine the negotiability of the union's proposal. If we find the proposal inconsistent with § 430.504(d), we will uphold the FLRA's determination of nonnegotiability, and that will be the end of the matter: BATF will have no obligation to bargain over the union's proposal. To be sure, BATF might decide of its own volition—free from the constraints of mandatory bargaining—to adopt the union's proposal, and if it did so OPM might pass on the proposal's consistency with § 430.504(d). But our ruling would have conclusively settled the negotiability question that was before us, about whether BATF was *obliged* to bargain over the proposal. Even if OPM issues an authoritative interpretation of § 430.504(d) and relies upon that interpretation in the course of its review of BATF's performance-awards plan, its action would only affect *subsequent* negotiability cases.

By the same token, if we decide that the union's proposal is consistent with § 430.-504(d), the FLRA will be precluded from basing its negotiability determination on the theory that the union's proposal conflicts with the regulation (at least in the absence of an intervening authoritative interpretation from OPM, see *infra* at 1516–17). The FLRA might find other grounds for reaching the same determination of nonnegotiability,

but this can hardly destroy our jurisdiction; we frequently remand matters to agencies while leaving open the possibility that the agencies can reach exactly the same result as long as they rely on the correct view of a law that they previously misinterpreted, or as long as they explain themselves better or develop better evidence for their position. See *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851–52 (D.C.Cir.1970). Alternatively, the FLRA might find no other basis for holding the proposal nonnegotiable, and might declare that BATF has a duty to bargain in good faith over the proposal. If the ensuing negotiations result in the adoption of the union's proposal (or if the union's proposal is imposed upon BATF after a bargaining impasse), OPM might again be called upon to pass on whether the substance of the proposal is consistent with § 430.504(d). Here too, however, the negotiability dispute—the question of whether BATF and the union had a duty to bargain in good faith over the union's proposal—will no longer be in issue. Whatever OPM does, its action would not mean that the duty to bargain in good faith had never existed, nor would it somehow act retroactively to deprive that duty of any legal effect.

Second, our decision on § 430.504(d) will define the legal limits for its interpretation, subject (as always) to the possibility of reversal by higher judicial authority and to the limits inherent in the doctrines governing the preclusive effects of judgments. The possible outcomes can be grouped in two categories. First, we might find the union's proposal to be in conflict with *any* reasonable interpretation of § 430.504(d). Besides having the necessarily concomitant effect of rejecting negotiability, such a judgment would bind the parties (and their "privies") on the issue, at least in the immediate controversy. Second, we might find that the union's proposal is consistent with *a* reasonable reading of § 430.504(d). Here there would be two sub-alternatives—that the union's proposal was, or was not, consistent with the reading we found most reasonable. Whichever way we went, OPM would presumably be free to adopt the reasonable reading that we had rejected. But such an OPM decision would in no way constitute a "review" of our ruling, or even a rejection of it; we would only have decided that *in the absence of any OPM position worthy of deference* the regulation means *X,* subject to the possibility that OPM might authoritatively declare it to mean *Y.* Cf. *Health Ins. Ass'n of America v. Shalala,* 23 F.3d 412, 423–25 (D.C.Cir.1994). An administrative interpretation may be unsustainable on the basis of what the agency has said, yet perfectly valid once it reveals its reasoning; the agency's later clarification is neither a reversal nor a review of the judicial decision. Here, too, the later adoption by OPM of a different reading from our own would simply have created a new set of facts, a set calling for judicial deference. The mere possibility of such developments—like the possibility of mootness—does not prevent the valid exercise of jurisdiction.

Finding no impediment to our assertion of jurisdiction, we turn to the merits.

### III.

■ Though the FLRA claims that we owe great deference to its negotiability determinations and that the scope of our review is narrow, it is right only up to a point. "Although we must give considerable deference to the Authority's construction of its enabling statute, we need not defer to ... its construction of regulations promulgated by other agencies, such as OPM." *National Treasury Employees Union v. FLRA,* 848 F.2d 1273, 1275 (D.C.Cir.1988). Accordingly, we owe deference to the FLRA's interpretation of the kind of inconsistency contemplated by 5 U.S.C. § 7117(a)(1) in its reference to proposals that are "not inconsistent with" government-wide regulations. We also owe deference to the FLRA's interpretation of the union's proposal. *Id.* at 1278. But we owe no deference to the FLRA's views about what OPM's regulation, 5 CFR § 430.504(d), means when it calls for performance awards to be "reviewed and approved" by agency officials. On that we owe deference only to OPM. See, e.g., *Department of the Army, Aberdeen Proving Ground v. FLRA,* 890 F.2d 467, 470, 474 (D.C.Cir.1989); *Office of Personnel Management v. FLRA,* 864 F.2d 165, 167, 171–72 (D.C.Cir.1988).

■ Since OPM has not announced an authoritative interpretation of § 430.504(d), we must construe the regulation for ourselves. And we disagree with the FLRA's understanding of it. While the union's proposal would certainly cabin the agency's discretion over the timing and amount of performance awards, and indeed over who will receive them, we do not think that it intrudes on any discretion that § 430.504(d) insists agencies must retain.

There is certainly a strong case for the FLRA's view. The regulation states that "[t]he decision to grant a performance award ... shall be reviewed and approved by an official of the agency who is at a higher level than the official who made the initial decision...." The union's proposal would make review of "the decision to grant a performance award" (as opposed to the decision about how *large* an award to grant) purely ministerial. Assuming that the agency's awards budget has adequate funds, every employee rated at least "Fully Satisfactory" would *have* to be granted a performance award, and so "review" of the decision to grant an award would consist entirely of checking that the employee did indeed receive a satisfactory rating.[1]

But we think it incorrect to read the regulation as drawing a sharp distinction between the decision to grant an award and the decision about the award's amount, and requiring that reviewing officials have discretionary disapproval power over both these decisions. The regulation itself indicates that the decision to grant an award "include[s] the amount of such award"; it is this *overall* decision that is subject to review and approval. And the union's proposal does not make review of *amounts* an essentially ministerial process.

It simply is not true that "the proposal leaves absolutely no room" for a variety of considerations stressed by the FLRA. See FLRA's Brief at 22. If "employees in different components [of BATF] who received the same rating were performing work of differing complexity and varying significance", *id.* at 20, the reviewing official (subject to budgetary constraints) would be free to ensure that their awards reflected these differences, as long as no one's award fell beneath the applicable minimum. The same goes for the other factors relevant to the reviewing process. The reviewing official could raise any award (subject to budgetary constraints), and he could cut any award to the extent that it exceeded the proposal's floors. While he might, as a practical matter, have less room to adjust some awards than others, a process of "review and approval" is not rendered meaningless merely because the reviewing official has little discretion over *some* of the cases that come before him.

The FLRA protests that the union's proposal would not give the reviewing official adequate room to correct for inaccurate performance appraisals, contrary to what the FLRA portrays as OPM's intention in promulgating § 430.504(d). The FLRA infers this intention from comments that OPM made in the context of the Performance Management and Recognition System ("PMRS"), a now-defunct system that applied to supervisors and managers; according to the FLRA, OPM asserted that the PMRS's parallel provision for higher-level review of performance awards, see 5 CFR § 540.105(b) (1986), was necessary to prevent "inaccurate appraisals and disproportionate pay and award amounts in some units within the organization". See FLRA's Brief at 21–22 (quoting 50 Fed.Reg. 35488, 35492 (Aug. 30, 1985)). In context, however, OPM was discussing the need for higher-level review of "*all* performance management decisions", not just review of perfor-

---

1. The union also claims that its proposal allows the reviewing official to make sure that awards are "in conformance with all governing statutory and regulatory requirements", and to disapprove awards that exceed the maximum amount permitted under 5 CFR § 430.504(a) or "that are found to be tainted by such unlawful factors as political favoritism, nepotism, or discrimination". Petitioner's Opening Brief at 18. The FLRA says that this interpretation of the propos-

al "may" be incorrect, because the proposal says that employees receiving the specified performance ratings "shall get" a performance award. FLRA's Brief at 23; see also *id.* at 26 n. 16. The FLRA does not contend, however, that the union's proposal is nonnegotiable because it calls upon agencies to make cash performance awards *even after it becomes clear that those awards are illegal or are based upon invalid performance appraisals.*

mance awards. 50 Fed.Reg. at 35492 (emphasis added). Under the PMRS, as under the regulations applicable to the BATF employees involved here, performance appraisals were themselves subject to such review, see 5 CFR § 430.407(c) (1986), and OPM did not say that the separate review of *award* decisions had to provide another opportunity for reviewing *appraisal* decisions. To the contrary, until 1992 the regulations governing review of awards decisions in the PMRS *required* all employees with a level 5 rating to receive awards of at least 2 percent of base pay, and declared that awards should also be granted to all employees with level 4 ratings. *Id.* § 540.109(d).

In sum, we disagree with the FLRA that the union's proposal intrudes upon discretion that § 430.504(d) requires reviewing officials to retain. We do not say that our interpretation of § 430.504(d) is the *only* reasonable one, but (in the absence of any authoritative guidance from OPM) we think it the *most* reasonable one.

Still, we see nothing to prevent the FLRA, on remand, from seeking an advisory opinion from OPM on the proper interpretation of § 430.504(d), pursuant to 5 U.S.C. § 7105(i). While our ruling settles the question of what the regulation means in the absence of any authoritative interpretation from OPM, the issuance of such an interpretation would "change[] the legal landscape". See *Health Insurance Ass'n of America*, 23 F.3d at 423. The doctrine of the law of the case, which ordinarily would require us to take the same view of the law in our review of the FLRA's actions on remand as we are taking now, contains an exception when the law itself has changed, see *Tongol v. Donovan*, 762 F.2d 727, 730 (9th Cir.1985) (intervening statute), or when an intervening interpretation of the law has been issued by a controlling authority, see, e.g., *Miles v. Kohli & Kaliher Assocs., Ltd.*, 917 F.2d 235, 241–42 (6th Cir. 1990) (intervening decision of state supreme court on matter of state law); *Cameo Convalescent Center v. Percy*, 800 F.2d 108, 110 (7th Cir.1986) (intervening decision of U.S. Supreme Court). Courts have also found law-of-the-case principles inapplicable even when the intervening interpretation of the

law comes from an authority whose views are only conditionally controlling. Thus in *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir.1988), the court found that an intervening decision of an *intermediate* state court—which would be binding in the absence of "persuasive data that the highest court of the state would decide otherwise", *West v. AT & T*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)—called for an exception to law-of-the-case doctrine. Accord *Delano v. Kitch*, 663 F.2d 990, 996 (10th Cir.1981). If OPM were to issue an authoritative (and reasonable) interpretation of § 430.504(d), and if the union's proposal conflicted with that interpretation of the regulation, we do not think that our decision would oblige the FLRA to order the parties to bargain over the proposal.

Of course, the question of what the FLRA can do on remand is a question about the law-of-the-case doctrine, and our understanding of that doctrine does not threaten our jurisdiction. If it were thought that the FLRA's ability on remand to rely on an intervening OPM interpretation would make our ruling here a mere advisory opinion, it would *not* follow that we have no jurisdiction to render any judgment on the merits in this case; all that would follow is that we are wrong about what the FLRA can do on remand, and that our judgment on the merits really does preclude it from finding the union's proposal inconsistent with § 430.504(d) *no matter what* OPM subsequently says. It would be absurd if the law-of-the-case doctrine, which describes the legal effect of our judgments, were so weak as to render those judgments beyond our power to make.

That said, we do not think that our view of what the FLRA can do on remand transcends this limit. Indeed, the legal effect of our decision here is analogous to the legal effect of our decisions in the innumerable cases that find an agency's action invalid for want of reasoned decisionmaking. There, we hold that the agency cannot take the same action in the absence of a better explanation for what it is doing; here, we hold that the FLRA cannot take the same action in the absence of an authoritative interpretation

from OPM revealing a conflict between § 430.504(d) and the union's proposal.

Of course, the FLRA remains free to find that the union's proposal conflicts with *other* statutory or regulatory provisions. But because we reject the FLRA's reason for finding the union's proposal nonnegotiable, we set aside the determination of nonnegotiability and remand for further proceedings.

*So ordered.*

SENTELLE, Circuit Judge, dissenting:

As the majority in today's decision holds, *Hayburn's Case,* 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792), establishes the principle of law that "a federal court is not presented with a justiciable case or controversy when its decision would go into effect only upon the approval of a reviewing official in the executive branch." Maj. op. at 1513. Of course I agree with the majority's formulation, but I would state the rule a bit more broadly: once a judgment has been rendered by an Article III court, review of that decision may be had only by resort to higher authority within the Article III system, *i.e.,* by appeal to a higher federal court. Judgments of Article III courts may not be abrogated by either Congress or the Executive; and an Article III court lacks jurisdiction to render judgments in any case that would be subject to inter-branch review.

The regulatory scheme at issue in this case authorizes the Office of Personnel Management (OPM) to second guess the judgments of this Court in violation of this fundamental constitutional principle. I would dismiss the petition for want of jurisdiction. Therefore, I respectfully dissent.

\*　　\*　　\*　　\*　　\*　.　\*

As the majority correctly points out, it is possible for us to render a judgment on the present petition that will not be subject to review by OPM: if we hold that the union's proposal conflicts with § 430.504(d), the parties will have no obligation to bargain. However, the opposite result gives me pause: if we hold that the proposal does not conflict

with the regulation, the parties will have to bargain in good faith,[1] but OPM can then render an opposed conclusion setting our judgment at naught. I do not accept the proposition that where one possible result of a case is not reviewable by an authority outside of the Article III courts, this is sufficient to survive a *Hayburn's Case* analysis of the entire question. The factual circumstances of *Hayburn's* itself instruct to the contrary.

The statute in *Hayburn's Case* directed that all veterans of the Revolutionary War "disabled in the actual service of the United States ... shall be entitled to be placed on the pension list of the United States." Act of Mar. 23, 1792, ch. 11, 1 Stat. 243, 244 (1792) (repealed in part and amended by Act of Feb. 28, 1793, ch. 17, 1 Stat. 324 (1793)). Persons seeking benefits under the statute were directed to appear in federal circuit court, which would first determine whether the petitioner was disabled "in the actual service of the United States," and would then determine the amount of any pension the petitioner should receive as compensation for his disability. In any case in which the court ruled that a veteran was entitled to a pension, the Act required the court to transmit its opinion to the Secretary of War, who would place the petitioner's name on the pension list. The Act provided, however, that if the Secretary had "cause to suspect imposition or mistake," he was entitled "to withhold the name of such applicant from the pension list, and make report of the same to Congress, at their next session." *Id.*

Under this statutory scheme, one possible result in the court proceeding was not subject to review by the Executive. The Act did not provide pension-seekers with any right of direct appeal to the Secretary of War. Thus, if the circuit court determined that the petitioner was *in*eligible for a pension, that was "the end of the matter." Maj. op. at 1513.

But if the circuit court decided that the petitioner was entitled to a pension, the court was to send its opinion to the Secretary of War, who would place the petitioner's name

---

1. Provided that, on remand, the FLRA does not come up with some other ground for concluding   that the proposal is nonnegotiable.

on the pension list, provided that he "had no cause to suspect imposition or mistake." As in the present case, one possible result under the statutory scheme reviewed in *Hayburn's Case* was not subject to review by the Executive. Nonetheless, the fact that the other possible disposition was subject to review outside the Article III system was sufficient to cause the Justices to opine (if not precisely to hold) for the first time in our nation's history that an Act of Congress ran afoul of the Constitution.

When *Hayburn's Case* arose, the Justices of the Supreme Court "rode circuit" and, sitting with district court judges, comprised the federal circuit courts. The five sitting Justices of the Supreme Court thus addressed the constitutionality of the Pension Act while sitting on three separate circuit court panels. Each panel unanimously refused to adjudicate the veterans' pension requests on the ground that the Act's provision for Executive review of the courts' judgments deprived them of jurisdiction.

The Justices sitting on the circuit court for the District of New York explained that the circuit court lacked jurisdiction to decide the initial question of the veterans' pension eligibility because

> the duties assigned to the Circuit Courts, by this act, are not [properly judicial] ... inasmuch as [the act] subjects the decisions of these courts ... first to the consideration and suspension of the Secretary at War, and then to the revision of the Legislature; whereas by the Constitution, neither the Secretary at War, nor any other Executive officer, nor even the Legislature, are authorized to sit as a Court of Errors on the judicial acts or opinions of this Court.

*Hayburn's Case*, 2 U.S. (2 Dall.) at 410 n. 1 (Opinion of Chief Justice Jay, Justice Cushing and District Judge Duane).

The Justices sitting in Pennsylvania offered nearly identical reasons for refusing to hear the veterans' petitions:

> We have been unanimously of the opinion, that under this act, the Circuit Court held for the Pennsylvania District could not proceed.... Because, if upon that business, the court had proceeded, its judg-

ments, for its opinions are its judgments, might, under the same act, have been revised and controlled by the Legislature, and by an officer in the Executive department. Such revision and control we deemed radically inconsistent with the independence of that judicial power which is vested in the courts; and, consequently, with that important principle which is so strictly observed by the Constitution of the United States.

*Id.* (Opinion of Justices Wilson and Blair and District Judge Peters).

Finally, the circuit court for the District of North Carolina declined jurisdiction because

> inasmuch as the decision of the Court is not made final, but may be at least suspended in its operation by the Secretary at War, if he shall have cause to suspect imposition or mistake; this subjects the decision of the court to a mode of revision which we consider to be unwarranted by the Constitution; for, though Congress may certainly establish ... courts of appellate jurisdiction, yet such courts must consist of Judges appointed in the manner the Constitution requires, and holding their offices by no other tenure than that of their good behavior, by which tenure the office of Secretary at War is not held.

*Id.* at 11 · (Opinion of Justice Iredell and District Judge Sitgreaves).

Judgments of Article III courts may not be reviewed by either Congress or the Executive. That is the rule of *Hayburn's Case*, restated numerous times throughout our constitutional history. *See, e.g., Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948) ("[I]f the President may completely disregard the judgment of the court, it would be only because it is one the courts were not authorized to render."); *United States v. Ferreira*, 54 U.S. (13 How.) 40, 14 L.Ed. 40 (1851) (district judge does not exercise "judicial power" under statutory scheme making his decisions reviewable by Secretary of the Treasury). Because I see no principled difference between an administrative agency which can second guess our decisions and an executive official

who can do the same thing, I would conclude that we lack jurisdiction to hear the present cause.

The question presented in this petition for review is whether the union's performance award proposal conflicts with 5 C.F.R. § 430.504(d), a government-wide regulation promulgated by OPM. The majority passes on that question and decides that the proposal and the regulation do not conflict. But it is undisputed that, at a later stage in the life of this same performance award proposal, OPM may also be called upon to decide whether the union's proposal conflicts with § 430.504(d). OPM's ability to disapprove a performance award plan based on its incompatibility with § 430.504(d) thus gives the agency a second bite at a question conclusively determined by this Court. In such a situation, our judgment that the performance award plan does not conflict with the regulation would have no more binding effect than if our judgment were directly reviewable by the President, *see Waterman*, 333 U.S. at 103, 68 S.Ct. at 431, the Secretary of the Treasury, *see Ferreira*, 54 U.S. (13 How.) at 40, or the Secretary of War, *see Hayburn's Case*, 2 U.S. (2 Dall.) at 408. The fact that OPM would not review this question of law until after the parties had negotiated the awards proposal, whereas we are asked to render a judgment before such negotiation, does not, in my mind, alleviate this problem.

The following hypothetical based on the facts of *Hayburn's Case* illustrates this point: Imagine a statute that, like the statute in *Hayburn's Case*, directs an Article III court to determine whether a veteran is disabled and whether he had become disabled "in the actual service of the United States." Unlike the statute in *Hayburn's*, however, this statute directs that after the court determines a petitioner's pension eligibility, the petitioner must negotiate the amount of his pension with the Secretary of the Treasury. Once the parties have reached an agreement, they are required to submit their pension proposal to the Secretary of War for final approval. The statute authorizes the Secretary to disapprove any pension request if he finds: 1) that the negotiated amount was unreasonable, or 2) that the petitioner was not actual-

ly "disabled in the actual service of the United States." I would submit that, under this statute, the court lacks jurisdiction to decide the initial question of pension eligibility, just as it did in *Hayburn's*. In both cases, the court's determination that a particular veteran meets the statutory requirements for a pension is subject to executive review.

The same jurisdictional defect plagues the present case. OPM regulations allow the agency at a later stage in this proceeding to render a decision that may overturn the judgment of this Court. As I read *Hayburn's Case*, we lack jurisdiction to decide such a case. I, therefore, respectfully dissent.