86 F.3d 1185
 152 L.R.R.M. (BNA) 2590, 318 U.S.App.D.C. 191
 GENERAL SERVICES ADMINISTRATION, National Capitol Region,
Federal Protective Service Division, Washington,
D.C., Petitioners,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent,
American Federation of Government Employees, AFL-CIO, Local
1733, Intervenor.
 No. 95-1498.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 10, 1996.
Decided June 14, 1996.
 
 Marc P. Richman, Counsel, United States Department of Justice, argued the cause for petitioner, with whom Frank W. Hunger, Assistant Attorney General, and William G. Kanter, Counsel, were on the briefs.
 David M. Smith, Solicitor, Federal Labor Relations Authority, argued the cause for respondent, with whom William R. Tobey, Deputy Solicitor, and James F. Blandford, Attorney, were on the brief. Mark D. Roth and Michael J. Schrier entered appearances.
 Before: EDWARDS, Chief Judge, SILBERMAN, and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 The General Services Administration petitions for review of a Federal Labor Relations Authority decision holding that GSA committed an unfair labor practice by failing to bargain before terminating a practice whereby its "special policemen" carried their firearms home. We grant the petition and remand for a determination of whether GSA must bargain over the impact and implementation of the policy change.
 
 I.
 
 2
 The Administrator of GSA is authorized to "appoint uniformed guards of [GSA] as special policemen ... for duty in connection with the policing of all buildings and areas owned or occupied by the United States and under the charge and control of the Administrator." 40 U.S.C. § 318(a) (1994). Accordingly, the Administrator has created the Federal Protective Service (FPS), the officers of which "have the same powers as sheriffs and constables" upon property under the GSA's charge. Id. § 318(b). FPS officers are provided with .38 caliber service revolvers under the Administrator's authorization "to furnish arms and ammunition" to the FPS "in the discharge of the duties ... conferred on him." 40 U.S.C. § 490(a)(2) (1994).
 
 
 3
 In years past, FPS officers left their guns at the building or property to which they were assigned at the end of each shift. By 1988, FPS officers--whose classification was changed from "Federal Protective Service Officers" to "Police Officers"--were no longer assigned to specific buildings but patrolled several buildings within portions of the Washington, D.C. metropolitan area. Their shifts began at FPS headquarters where they obtained their patrol assignments and firearms, which were checked in when the shifts ended. In 1991, during Operation Desert Storm, FPS officers worked 13-hour shifts, 7 days a week to protect federal buildings against potential terrorist acts, and were temporarily permitted--though not required--to carry their weapons between home and work to facilitate more rapid deployment. After the threat subsided, a GSA Assistant Commissioner "extended indefinitely" the home carriage policy as "consistent with effective operational practices."
 
 
 4
 In 1993, the Assistant Commissioner inquired about the feasibility of issuing a general order permitting home carriage. The Associate General Counsel, Real Property Division, opined that the practice was unauthorized. He cited a 1972 opinion by the Department of Justice Office of Legal Counsel and a 1978 opinion by GSA's General Counsel, both to the effect that home carriage by FPS officers was unlawful because it did not meet the implicit statutory requirement that it be "necessary or reasonably related to the performance of their official duties."[1] Both of these earlier opinions pointed to the FPS' limited jurisdiction--i.e., individual buildings--and noted that courts had determined that security officers with similarly limited jurisdictions were not exempted from the District of Columbia's firearms prohibition on carrying deadly weapons. Based on the Associate General Counsel's memorandum, and without notice to the FPS officers' bargaining representative, GSA barred the practice. The officers' union asked GSA to bargain over the change and, when rebuffed, filed an unfair labor practice charge.
 
 
 5
 The FLRA's General Counsel filed a complaint. The ALJ subsequently determined that GSA was not obliged, under Authority precedent, to bargain before ending an illegal term or condition of employment and decided that GSA in "good faith, reasonably concluded, based upon available resources, that the practice of permitting police officers to carry their weapons home when off duty was illegal." Since he found it de minimis, the ALJ also ruled that GSA was not obliged to bargain over the impact of the change.
 
 
 6
 The Authority reversed. An agency's good faith was said to be "irrelevant in determining whether a change is unlawful." The Authority decided that "the Judge erred in determining that the Agency's showing of possible illegality of the Agency's practice was sufficient to conclude that the Agency did not violate the [Federal Service Labor-Management Relations Statute, 5 U.S.C. §§ 7101-7135 (1994) ] by unilaterally changing its practice" (emphasis added). The FLRA was not persuaded by the 1972 and 1978 opinions relied on by GSA and thought that the FPS officers' expanded duties and on-call status "might justify" home carriage under the exceptions set forth in the OLC opinion. Without deciding the underlying legal issue, the FLRA ordered GSA to reinstate the practice and not to terminate it without notice to and bargaining with its officers' union.[2]
 
 II.
 
 7
 It is undisputed that if the practice of FPS officers carrying guns home was illegal GSA is not obliged to bargain with the union over the decision to return to the pre-Gulf War situation. Whether such a practice is illegal depends on the Administrator's determination as to whether firearms are appropriately carried home by the officers "in the discharge of [his] duties" and, thereby, their duties. That determination is not purely discretionary; the government contends that the Administrator could not legally permit the officers to carry guns home absent an emergency such as the Gulf War. Still, the Authority is obviously uncomfortable in recognizing the Administrator's power to erect a legal barrier around a decision relating to the officers' duties, concerning which the union would normally wish to bargain. Accordingly, the FLRA refused to defer to the government's interpretation of the statute.
 
 
 8
 But it is clear that Congress intended that FPS officers would be permitted to carry firearms (a rather sensitive matter) only insofar, in OLC's words, as the Administrator deemed it "necessary or reasonably related to the performance of their official duties." In the absence of that determination, an officer carrying a gun would violate D.C. criminal law. See, e.g., Middleton v. United States, 305 A.2d 259, 261-62 (D.C.App.1973). The Authority, apparently recognizing how thin is the ice on which it is skating, did not presume to conclude that the practice was legal; it somewhat illogically--particularly in light of its criticism of the ALJ--declined to accept the government's interpretation and put the matter to bargaining, sidestepping the legal question. That course, however, could lead to a bargaining impasse, which would be resolved by an impasse panel determination as to whether officers could carry guns home. See, e.g., Council of Prison Locals v. Brewer, 735 F.2d 1497, 1500-01 (D.C.Cir.1984). Such an outcome would be inconsistent with congressional intent that it be the Administrator's decision.
 
 
 9
 This situation is far removed from Department of Health & Human Services v. FLRA, 920 F.2d 45 (D.C.Cir.1990), upon which the Authority relies. In that case we held that the Authority, not an agency, was entitled to deference as to "the compelling need" for, and consequent nonnegotiability of, a regulation. That was because the term "compelling need" is in the FLRA's statute and the Authority was directed by Congress to issue a regulation defining it. This statute, by contrast, is administered by GSA and it is to GSA, not the FLRA, we must look for its meaning. See, e.g., National Treasury Employees Union v. FLRA, 30 F.3d 1510, 1514 (D.C.Cir.1994); United States Information Agency v. FLRA, 895 F.2d 1449, 1452 (D.C.Cir.1990). So should have the FLRA which, perforce, must grant an agency the same deference to its interpretation of an authorizing statute that we would.
 
 
 10
 The manner in which GSA offered its interpretation, contrary to the Authority's argument, does not militate against deference. To be sure, the Administrator did not issue a regulation setting forth his interpretation nor was there any administrative "adjudication" of the issue. But on such a question--a legal interpretation of a statute governing practices of employees--there really is no occasion or need for the agency to adopt either procedure. We will defer to an agency's interpretation of its statute even if proffered outside administrative adjudication or rulemaking so long as we are assured it is the "official interpretation." We have even deferred to "agency counsel's litigative positions" where we were certain that they did not differ from the agency's. FLRA v. Department of the Treasury, 884 F.2d 1446, 1455 (D.C.Cir.1989), cert. denied, 493 U.S. 1055, 110 S.Ct. 863, 864, 107 L.Ed.2d 947, 948 (1990); Women Involved in Farm Economics v. Department of Agriculture, 876 F.2d 994, 998-1000 (D.C.Cir.1989), cert. denied, 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990).
 
 
 11
 "Once it is determined to whom deference is owed, there is not a good deal left to this case," because the statute does not demarcate the outer bounds of the firearms authorization, and we "must therefore defer to any reasonable interpretation or application of it." Department of Health & Human Serv., 920 F.2d at 48. The agency's 1993 memorandum returned its FPS firearm policy to the general rule it had followed with only one interruption since 1972. The 1972 and 1978 opinions pointed out that D.C. courts have not been inclined generously to read exemptions to the District's gun prohibitions for officers like FPS'. See Middleton, 305 A.2d 259; McKenzie v. United States, 158 A.2d 912 (D.C.App.1960). GSA reasonably rejects the Authority's suggestion that the officers' expanded duties and new title might justify home carriage as duty-related. Their authority remains limited to discrete locations and because they have no authority elsewhere, they have no duty-related reason, absent exceptional circumstances, to carry weapons elsewhere.
 
 
 12
 We, therefore, do not see how GSA's abandonment of its Gulf War practice that extended beyond that emergency can be challenged. The FLRA faults GSA's 1993 memorandum for failing explicitly to consider whether changed circumstances brought present-day home carriage into one of the exceptions to the prohibition set forth in OLC's opinion. Since FPS officers are now subject to immediate recall (due to a shortage of officers), it is argued, the exception for "a riot situation when [officers] might be subject to special call to places not ascertainable in advance" might apply. And, since officers are no longer assigned to one building or property, home carriage might be permitted because "some officers are assigned to different and widely separated buildings over different days." These "suggestions" exceed the Authority's writ. It is the Administrator who has the responsibility of determining when the officers' duties dictate gun carriage.
 
 
 13
 In sum, GSA reasonably interpreted its statute and it cannot be forced to bargain over the discontinuation of home carriage. On remand, it remains open whether GSA must negotiate over its impact and implementation.
 
 
 14
 * * *
 
 
 15
 Accordingly, we grant the petition for review, deny the cross-petition for enforcement, and remand.
 
 
 
 [1]
 The OLC opinion "envision[ed]":
 circumstances in which a Federal Protective Service officer may have a special duty-related reason to carry his weapon while off-duty. For example, if some officers are assigned to different and widely separated buildings on different days, the only feasible procedure might be for them to take their weapons home with them overnight. The same might be true during a riot situation when they might be subject to special call to places not ascertainable in advance.
 
 
 [2]
 Member Armendariz agreed with GSA that home carriage was illegal, but would have ordered bargaining over the impact and implementation of the home carriage ban