In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 14-1953

ASSOCIATION OF ADMINISTRATIVE LAW JUDGES, JUDICIAL
  COUNCIL NO. 1, IFPTE, AFL-CIO & CLC, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CAROLYN W. COLVIN, Acting Commissioner of
  Social Security,

*Defendant-Appellee*.

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 2925 — **Sharon Johnson Coleman**, *Judge*.

———————

ARGUED DECEMBER 9, 2014 — DECIDED JANUARY 23, 2015

———————

Before POSNER, RIPPLE, and KANNE, *Circuit Judges*.

POSNER, *Circuit Judge*. The Association of Administrative
Law Judges (its cumbersome official name is given in the
caption) is a union that, so far as relates to this case, repre-
sents the Social Security Administration's administrative law
judges in collective bargaining with the Administration,
pursuant to the Federal Labor-Management Relations Act, 5

U.S.C. §§ 7101 *et seq.* The Association, together with three administrative law judges employed by the Social Security Administration, are the plaintiffs in this suit, which, though the named defendant is the head of the Administration, is really a suit against the Administration itself because she is being sued in her official capacity.

The plaintiffs contend that, by requiring its administrative law judges to decide at least 500 social security disability cases a year the Administration has interfered with the administrative law judges' decisional independence, in violation of the Administrative Procedure Act, which provides that when conducting a hearing an administrative law judge is not subject to direction or supervision by other employees of the agency that he is employed by and may not be assigned duties inconsistent with his duties and responsibilities as an administrative law judge. 5 U.S.C. §§ 554(d)(2), 3105.

In October 2007 the Social Security Administration's chief administrative law judge issued a directive setting as a "goal" for the administrative law judges that each one "manage their docket in such a way that they will be able to issue 500–700 legally sufficient decisions each year." (When the directive was issued, 56 percent of the administrative law judges were deciding fewer than 500 cases a year.) Although it is described as a goal, the plaintiffs claim in their 37-page, 126-paragraph complaint that the Administration has taken formal and informal disciplinary measures to enforce it, so that it is in effect an enforceable and enforced quota. The purpose of the goal or quota is to reduce the backlog of disability cases.

The district court dismissed the complaint for want of subject-matter jurisdiction, holding that the Civil Service Reform Act of 1978 (sections of which are scattered throughout title 5 of the U.S. Code) precludes the plaintiffs' resort to the Administrative Procedure Act. The Civil Service Reform Act creates remedies for "prohibited personnel practices" taken against federal employees, and defines "personnel practices" to include "significant change in duties, responsibilities, or working conditions." 5 U.S.C. §§ 2302(a)(1), (2)(A)(xii), (b). Subsection (b) has a long list of the prohibited personnel practices, most of which are various types of discrimination. The district judge ruled that the plaintiffs were alleging a "significant change in duties, responsibilities, or working conditions," and if this is correct, their exclusive remedy is under the Civil Service Reform Act. It is correct. Increasing an employee's production quota changes his or her duties and responsibilities, and therefore working conditions. But the plaintiffs have no remedy under that Act either, even if they're right that the challenged order is a quota rather than a goal, because the Act does not prohibit an increase in a production quota unless the increase violates a prohibition listed in 5 U.S.C. § 2302(b), and the increase challenged in this case does not.

The plaintiffs argue that because it takes less time for an administrative law judge to award social security disability benefits than to deny benefits, because an award is not judicially appealable and therefore the administrative law judge doesn't have to be as careful in his analysis of the disability claim (doesn't, in short, have to try to make his decision appeal proof), the effect of the quota (as we'll call the "goal," thus giving the plaintiffs the benefit of the doubt) is to induce administrative law judges to award more benefits:

were it not for the quota, they would deny benefits whenever they thought the applicant wasn't entitled to them under the law, even if making that determination took a lot of time. The argument is thus that the quota alters the administrative law judges' preferred ratio of grants to denials of benefits and by doing so infringes their decision-making independence.

The argument would have merit if the Social Security Administration had imposed the quota because it wanted a higher rate of benefits awards, but that is not contended. If the result of the quota is that the percentage of such awards has risen—and in fact there is evidence that the administrative law judges who decide the most cases per year also award benefits in a higher percentage of their cases than do the administrative law judges who decide fewer cases per year—this is not contended to be an aim of the quota, but an unintended and presumably unwanted byproduct. Because the social security disability insurance trust fund is on the verge of being exhausted, see Rachel Greszler, "Social Security Disability Insurance Trust Fund Will Be Exhausted in Just Two Years: Beneficiaries Facing Nearly 20 Percent Cut in Benefits," Aug. 1, 2014 (The Heritage Foundation, *Research*), www.heritage.org/research/reports/2014/08/social-security-disability-insurance-trust-fundwill-be-exhausted-in-just-two-years-beneficiaries-facing-nearly-20-percent-cut-in-benefits, the Social Security Administration is under pressure to reduce, not increase, the aggregate disability benefits that its administrative law judges award—which in 2012 was $137 billion. U.S. Social Security Administration, Office of Retirement and Disability Policy, Annual Statistical Supplement, 2013, "Highlight and Trends," www.ssa.gov/policy/docs/statcomps/supplement/2013/highlights.html.

(Both websites were visited on Jan. 10, 2015.) The aim of the quota is to speed up decision-making rather than to prod administrative law judges to grant more applications for disability benefits.

Of course any change in work duties, responsibilities, or working conditions might affect an administrative law judge's decision-making. Beyond some point, increasing a worker's quota is going to induce him to spend less time on each task. If he is a worker on a poultry processing assembly line and the conveyor belt that carries the chickens to his work station for deboning is speeded up, he will spend less time deboning each chicken than he might think desirable to make sure no bits of bone are left in the chicken when it leaves his work station on the conveyor belt. In other words, the quality of his output would decline. Yet he would not be heard to claim that his decisional independence was being compromised. His situation would parallel that of the administrative law judges. The time pressure on him would result in a reduction in the quality of his work. Similarly, the plaintiffs allege that because of the quota, the quality of the administrative law judges' work decreases because they grant benefits in cases in which, had they more time, they would have denied benefits; the quota thus affected their decision-making.

Suppose the Social Security Administration hired more administrative law judges, thus reducing the workload of each one. With less pressure to grant benefits in order to make the quota, the administrative law judges might, because they were spending more time on each case, increase the fraction of benefit denials. But who would argue that in-

creasing a work force is an actionable interference with the workers' decisional independence?

In the 1960s and 1970s there were very steep increases in federal court caseloads, and increases in the number of judgeships lagged. So each judge had to work harder. Maybe some judges responded by dismissing more cases earlier than they would have preferred to do. Would this have meant that by failing to increase the number of judges in proportion to the increase in caseload, the government was interfering with federal judges' decisional independence? The answer is no, and it is no here as well, and were it otherwise the courts would be flooded with cases brought by civil servants complaining that, as an incidental and unintended effect of a change in their working conditions, they had decided to reduce the amount of effort they devoted to each task they were assigned. An incidental and unintentional effect of a change in working conditions is not actionable under the Administrative Procedure Act.

We are mindful that the District of Columbia Circuit, in *Mahoney v. Donovan*, 721 F.3d 633 (D.C. Cir. 2013), went even further, ruling that *any* action alleged to interfere with an administrative law judge's decisional independence is a personnel action governed exclusively by the Civil Service Reform Act even though that Act provides no remedy for personnel actions that interfere—even that intentionally interfere—with decisional independence. That ruling, if sound, would nullify the express protection of such independence in the Administrative Procedure Act. We doubt that it's sound but need not pursue the issue in this case. The other cases cited in Judge Ripple's concurring opinion do not involve claims relating to the infringement of decisional inde-

pendence. But we are mindful of his suggestion that administrative law judges whose decisional independence is interfered with by their superiors might have a constitutional remedy. Although the suggestion opens up a rather frightening vista of constitutional claims by administrative law judges employed by the federal government, of whom some 1400 are employed by the Social Security Administration alone, we can imagine a case in which a change in working conditions could have an unintentional effect on decisional independence so great as to create a serious issue of due process. Suppose that solely for the sake of administrative efficiency the Social Security Administration ordered that disability hearings were to last no more than 15 minutes. The quality of justice meted out by the administrative law judges would be dangerously diminished. But all that matters for the decision of the present case is that the administrative law judges' remedy under the Administrative Procedure Act for interference with their decisional independence does not extend to the incidental consequences of a bona fide production quota.

AFFIRMED.

RIPPLE, *Circuit Judge*, concurring. My colleagues have attempted to cabin narrowly their holding. Noting that the District of Columbia Circuit has held squarely that *any* "personnel action" that interferes with decisional independence is remediable, if at all, through the administrative mechanisms of the Civil Service Reform Act ("CSRA"), *see Mahoney v. Donovan*, 721 F.3d 633, 636 (D.C. Cir. 2013), they stress that this circuit simply holds today that the administrative law judges' remedy under the Administrative Procedures Act ("APA") for interference with their decisional independence does not extend to the incidental consequences of a bona fide production quota.

Placing a decision interpreting the gnarled intersection of two statutory schemes on narrow grounds is, in most instances, a commendable path. I am skeptical, however, about the appropriateness of such an approach in this situation and write to set forth the reasons for my skepticism.

If, as the court intimates, only bona fide personnel actions that tread incidentally on decisional independence are exempted from the strictures of the APA, we must be prepared to undertake the gargantuan task of determining, every time a decisional independence allegation is made, whether the governmental action is taken in good faith. The statutory scheme lacks, of course, any such "bona fides" criterion—and for good reason. It would require judges to dig into the subjective intent of executive and agency officials. It is difficult to imagine how such an inquiry would be compatible with Congress's manifest intent in the CSRA to limit judicial intrusion into the day-to-day management of executive and regulatory government.

Moreover, the approach taken by the court today is in significant tension with the doctrinal path hewed by the Supreme Court and this circuit—a path that cuts a far broader path for the scope of the CSRA.

I will discuss both of these reservations in turn.

### A.

The Supreme Court has addressed on several occasions the preemptive effect that the CSRA has with respect to complaints by federal employees about employment matters. *See Elgin v. Dep't of the Treasury*, 132 S. Ct. 2126 (2012); *United States v. Fausto*, 484 U.S. 439 (1988). In *Fausto*, the Court considered whether a nonpreference excepted service employee could challenge his suspension in the United States Claims Court, even though the CSRA did not then afford him a right to review in either the Merit Systems Protection Board ("MSPB") or the Federal Circuit. The Court held that

> [t]he comprehensive nature of the CSRA, the attention that it gives throughout to the rights of nonpreference excepted service employees, and the fact that it does not include them in provisions for administrative and judicial review contained in Chapter 75, combine to establish a congressional judgment that those employees should not be able to demand judicial review for the type of personnel action covered by that chapter.

*Fausto*, 484 U.S. at 448.

The Court's more recent pronouncement on the CSRA, *Elgin*, concerned former federal employees who had failed to comply with the Selective Service Act and were therefore discharged by their employing agencies. *See* 132 S. Ct. at 2131. One of the former employees, Elgin, appealed his removal to the MSPB and argued that the selective service requirement was unconstitutional. The MSPB referred the issue to an ALJ for initial decision, and the ALJ dismissed the appeal for lack of jurisdiction, "concluding that an employee is not entitled to MSPB review of agency action that is based on an absolute statutory bar to employment." *Id.* Elgin did not petition for review by the full MSPB, nor did he appeal to the Federal Circuit. Instead, he filed suit in district court seeking a declaratory judgment that the challenged statute was unconstitutional; he also requested reinstatement, backpay, benefits, and attorneys' fees.

Before the Supreme Court, Elgin argued that the grant of general federal question jurisdiction, 28 U.S.C. § 1331, provided authority for the district court to entertain his action. The Court disagreed. Analogizing the case before it to *Fausto*, the Court stated:

> Just as the CSRA's "elaborate" framework demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review, it similarly indicates that extrastatutory review is not available to those employees to whom the CSRA *grants* administrative and judicial review. Indeed, in *Fausto* we expressly assumed that "competitive service employees,

> who *are* given review rights by Chapter 75,
> cannot expand these rights by resort to"
> judicial review outside of the CSRA scheme.
> As *Fausto* explained, the CSRA "prescribes in
> great detail the protections and remedies
> applicable to" adverse personnel actions
> against federal employees.…Given the
> painstaking detail with which the CSRA sets
> out the method for covered employees to
> obtain review of adverse employment actions,
> it is fairly discernible that Congress intended to
> deny such employees an additional avenue of
> review in district court.

*Id.* at 2133–34 (citations omitted) (quoting *Fausto*, 484 U.S. at 443, 450 n.3).

We also have considered the scope of the CSRA's preemptive effect on at least two occasions and reached decisions compatible with the Supreme Court's decisions. In *Paige v. Cisneros*, 91 F.3d 40 (7th Cir. 1996), a HUD attorney had challenged his discharge in district court. The district court held that the plaintiff's administrative hearing was constitutionally inadequate and remanded for further proceedings. The plaintiff appealed, however, arguing that once the court had determined that there was a constitutional violation, it should not have remanded the matter to HUD. We determined that "the district court lacked authority to remand the case to HUD, but for a different reason: It hadn't subject matter jurisdiction. By the [CSRA], Congress gave exclusive jurisdiction over civil service personnel disputes to the Merit Systems Protection

Board (MSPB)." *Id.* at 42 (citation omitted). We further explained:

> Since Paige could not appeal to the MSPB, the district court thought it appropriate to order the creation of a parallel administrative apparatus through which he could challenge his termination. This action was unwarranted because it failed to accord respect to the administrative system established by statute for reviewing federal personnel actions. A statute providing for review of some claims but not others means that the "others" (like Paige's) don't receive review; it does not mean that judges should disregard the exclusions and order the agency to provide a comparable administrative review anyway.

*Id.* at 42–43.

We reached a similar decision in *Richards v. Kiernan*, 461 F.3d 880 (7th Cir. 2006). Richards, a former ATF employee, "brought suit against his supervisors alleging that they violated his First Amendment rights by retaliating against him for his whistleblowing activities"; indeed, he had resigned his position citing a hostile work environment. *Id.* at 882. He first filed a formal complaint of discrimination with the ATF, which was denied. He then turned to the Office of Special Counsel. That claim and the appeal also failed. Richards then filed a complaint in the district court alleging constructive discharge and retaliation; he voluntarily dismissed that action, however, to pursue claims through the MSPB. "The MSPB held that it lacked jurisdiction over Richards' discharge claim, concluding that

he had voluntarily retired, and denied the whistleblower claim finding that Richards had not made any protected disclosures." *Id.* at 883. Rather than appealing that adverse ruling to the Federal Circuit, Richards reinstated his First Amendment claim in the district court. The district court dismissed for lack of jurisdiction, and we affirmed, explaining that, "[b]y creating the CSRA, Congress implicitly repealed the jurisdiction of federal district courts over personnel actions arising out of federal employment." *Id.* Moreover, the fact that Richards was asserting a constitutional challenge did not change the analysis.

In short, a conclusion that the federal courts lack jurisdiction over any claim of interference with decisional independence falls squarely within the extant jurisprudence on the subject. Today's opinion establishes a different framework, and, although it does not alter the result, it sets us up to travel a different and highly problematic road in the future.

**B.**

The majority suggests that the administrative law judges, if they are able to show a lack of bona fides, can challenge departmental or agency action trenching on their decisional independence. Although I am skeptical that the CSRA permits them to pursue such a course, I also believe that even the absence of a judicial remedy does not mean that there is an absence of a constitutional violation. Rather, it simply means that Congress has not seen fit to entrust such a systemic issue to the administrative or judicial process.

Despite the lack of judicial redress, both statutory design[1] and, to some degree, constitutional imperative,[2] require that the integrity of the administrative judges' decision-making process be respected. It is very possible that executive or administrative authorities can so burden the exercise of that judicial decision-making process that the congressional intent of protecting the administrative law judges can be fundamentally impaired. Such an impairment, should it occur, is far more than an "incidental and undesired effect," Maj. Op. 6, of the adjudicative process. Congress, under the present scheme, apparently has decided to leave the decision as to whether such a systemic impairment is occurring to its own scrutiny—and perhaps the scrutiny of the courts if a *litigant* should ever raise it as a matter of due process of law (a seemingly gargantuan task).

---

[1] *See Butz v. Economou*, 438 U.S. 478, 513 (1978) ("[T]he process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency.").

[2] *See Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (holding that, in evaluating the licensure decision of a state administrative board, "[i]t is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes"); *see also Ward v. Vill. of Monroeville*, 409 U.S. 57, 60 (1972) (holding that a quasi-judicial official cannot, consonant with due process, act as a decisionmaker when he is placed in a situation "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused" (internal quotation marks omitted)); *Tumey v. Ohio*, 273 U.S. 510, 522 (1927) ("That officers acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy to be decided is, of course, the general rule.").

Serious impairment of a governmental function can occur at the hands of officials with the most worthy of motives. The integrity of the judicial function, at *any* level of adjudication, can be undermined seriously by even the most benignly motivated administrative or executive action that alters the essential function of adjudication. Officials charged with the responsibility "to get the job done" must devise methods and measures for achieving that goal. Devising such tools always requires, however, balancing considerations of efficiency with respect for the core functions of the governmental unit involved—here the adjudication of cases.

The administrative adjudicative process is a vital part of our system of administering justice in today's United States. Indeed, it is in the administrative process that most Americans have any contact with the American justice system. Here, their Government decides whether their elderly family members will receive a steady, albeit basic, income stream in their old age. Here, those in their family who have the misfortune of coping with a physical or psychiatric disability find whether they are eligible for sufficient support to live in some semblance of economic dignity. Administrative law judges affect directly the lives of millions; the quality of their work deeply affects, moreover, the respect that our people have for our system of justice. The rights of Americans are not *processed* by our judges; they are *adjudicated*. The task of adjudication at the administrative level involves an intimate knowledge of a complicated statutory scheme and the capacity to comprehend and analyze technical and, at times, conflicting statutory material. The judge must have the practical wisdom to evaluate the value of testimony, some of it true, some of it

untrue, and some of it simply mistaken. Even though we review the decisions of these officers under a deferential standard, we know well that these analytical and evaluative tasks alone are time-consuming and demand great attention to detail.

Finally, I cannot accept even the slightest intimation that the exercise of legislative power, even with the most benign of motivations, could not constitute a significant constitutional impairment of our own work. That the courts of the Third Article cannot be burdened with non-adjudicatory responsibilities has long been established.[3] I see no reason why we should take as a given that those same courts ever can be similarly impaired by being deprived of the tools necessary to achieve their assigned task with integrity.[4]

With these considerations in mind, I am pleased to join the judgment of the court.

---

[3] "As a general rule, we have broadly stated that 'executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution.'" *Morrison v. Olson*, 487 U.S. 654, 677 (1988) (quoting *Buckley v. Valeo*, 424 U.S. 1, 123 (1976)); *see also United States v. Ferreira*, 54 U.S. (13 How.) 40, 48–51 (1852); *Hayburn's Case,* 2 U.S. (2 Dall.) 409, 411 (1792).

[4] *See* Hon. Deanell Reece Tacha, *Independence of the Judiciary for the Third Century,* 46 Mercer L. Rev. 645, 648 (1995) ("In order for a judge to handle her caseload and maximize productivity, she implicitly must possess adequate staff, equipment, and physical facilities to carry out her responsibilities. Independent judicial action requires an appropriate level of support which allows a judge to carry out the judicial function without relying on other entities, depending on someone else's assessment of the judge's needs, or giving any thought in the case-deciding role to tangential factors that might influence the speed of deliberation or the outcome.").